# LOCKETT *v.* OHIO

No. 76–6997.  Argued January 17, 1978—Decided July 3, 1978

BURGER, C. J., announced the Court's judgment and delivered an opinion of the Court with respect to Parts I and II, in which STEWART, WHITE, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined, and an opinion with respect to Part III, in which STEWART, POWELL, and STEVENS, JJ., joined. BLACKMUN, J., filed an opinion concurring in part and concurring in the judgment, *post,* p. 613. MARSHALL, J., filed an opinion concurring in the judgment, *post,* p. 619. WHITE, J., filed an opinion concurring in part, concurring in the judgment, and dissenting in part, *post,* p. 621. REHNQUIST, J., filed an opinion concurring in part and dissenting in part, *post,* p. 628. BRENNAN, J., took no part in the consideration or decision of the case.

*Anthony G. Amsterdam* argued the cause for petitioner. With him on the brief were *Max Kravitz, Jack Greenberg, James M. Nabrit III, Joel Berger, David E. Kendall,* and *Peggy C. Davis.*

*Carl M. Layman III* argued the cause for respondent. With him on the brief were *Stephan M. Gabalac* and *James A. Rudgers.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court with respect to the constitutionality of petitioner's conviction (Parts I and II), together with an opinion (Part III), in which MR. JUSTICE STEWART, MR. JUSTICE POWELL, and MR. JUSTICE STEVENS joined, on the constitutionality of the statute under which petitioner was sentenced to death, and announced the judgment of the Court.

We granted certiorari in this case to consider, among other questions, whether Ohio violated the Eighth and Fourteenth Amendments by sentencing Sandra Lockett to death pursuant to a statute [1] that narrowly limits the sentencer's discretion to consider the circumstances of the crime and the record and character of the offender as mitigating factors.

I

Lockett was charged with aggravated murder with the aggravating specifications (1) that the murder was "committed for the purpose of escaping detection, apprehension, trial, or punishment" for aggravated robbery, and (2) that the murder was "committed while . . . committing, attempting to commit, or fleeing immediately after committing or attempting to commit . . . aggravated robbery." That offense was punishable by death in Ohio. See Ohio Rev. Code Ann. §§ 2929.03, 2929.04 (1975). She was also charged with aggravated robbery. The State's case against her depended largely upon the testimony of a coparticipant, one Al Parker, who gave the following account of her participation in the robbery and murder.

Lockett became acquainted with Parker and Nathan Earl Dew while she and a friend, Joanne Baxter, were in New Jersey. Parker and Dew then accompanied Lockett, Baxter, and Lockett's brother back to Akron, Ohio, Lockett's home-

---

[1] The pertinent provisions of the Ohio death penalty statute appear as an appendix to this opinion.

town. After they arrived in Akron, Parker and Dew needed money for the trip back to New Jersey. Dew suggested that he pawn his ring. Lockett overheard his suggestion, but felt that the ring was too beautiful to pawn, and suggested instead that they could get some money by robbing a grocery store and a furniture store in the area. She warned that the grocery store's operator was a "big guy" who carried a "45" and that they would have "to get him real quick." She also volunteered to get a gun from her father's basement to aid in carrying out the robberies, but by that time, the two stores had closed and it was too late to proceed with the plan to rob them.

Someone, apparently Lockett's brother, suggested a plan for robbing a pawnshop. He and Dew would enter the shop and pretend to pawn a ring. Next Parker, who had some bullets, would enter the shop, ask to see a gun, load it, and use it to rob the shop. No one planned to kill the pawnshop operator in the course of the robbery. Because she knew the owner, Lockett was not to be among those entering the pawnshop, though she did guide the others to the shop that night.

The next day Parker, Dew, Lockett, and her brother gathered at Baxter's apartment. Lockett's brother asked if they were "still going to do it," and everyone, including Lockett, agreed to proceed. The four then drove by the pawnshop several times and parked the car. Lockett's brother and Dew entered the shop. Parker then left the car and told Lockett to start it again in two minutes. The robbery proceeded according to plan until the pawnbroker grabbed the gun when Parker announced the "stickup." The gun went off with Parker's finger on the trigger, firing a fatal shot into the pawnbroker.

Parker went back to the car where Lockett waited with the engine running. While driving away from the pawnshop, Parker told Lockett what had happened. She took the gun from the pawnshop and put it into her purse. Lockett and

Parker drove to Lockett's aunt's house and called a taxicab. Shortly thereafter, while riding away in a taxicab, they were stopped by the police, but by this time Lockett had placed the gun under the front seat. Lockett told the police that Parker rented a room from her mother and lived with her family. After verifying this story with Lockett's parents, the police released Lockett and Parker. Lockett hid Dew and Parker in the attic when the police arrived at the Lockett household later that evening.

Parker was subsequently apprehended and charged with aggravated murder with specifications, an offense punishable by death, and aggravated robbery. Prior to trial, he pleaded guilty to the murder charge and agreed to testify against Lockett, her brother, and Dew. In return, the prosecutor dropped the aggravated robbery charge and the specifications to the murder charge, thereby eliminating the possibility that Parker could receive the death penalty.

Lockett's brother and Dew were later convicted of aggravated murder with specifications. Lockett's brother was sentenced to death, but Dew received a lesser penalty because it was determined that his offense was "primarily the product of mental deficiency," one of the three mitigating circumstances specified in the Ohio death penalty statute.

Two weeks before Lockett's separate trial, the prosecutor offered to permit her to plead guilty to voluntary manslaughter and aggravated robbery (offenses which each carried a maximum penalty of 25 years' imprisonment and a maximum fine of $10,000, see Ohio Rev. Code Ann. §§ 2903.03, 2911.01, 2929.11 (1975)) if she would cooperate with the State, but she rejected the offer. Just prior to her trial, the prosecutor offered to permit her to plead guilty to aggravated murder without specifications, an offense carrying a mandatory life penalty, with the understanding that the aggravated robbery charge and an outstanding forgery charge would be dismissed. Again she rejected the offer.

At trial, the opening argument of Lockett's defense counsel summarized what appears to have been Lockett's version of the events leading to the killing. He asserted the evidence would show that, as far as Lockett knew, Dew and her brother had planned to pawn Dew's ring for $100 to obtain money for the trip back to New Jersey. Lockett had not waited in the car while the men went into the pawnshop but had gone to a restaurant for lunch and had joined Parker, thinking the ring had been pawned, after she saw him walking back to the car. Lockett's counsel asserted that the evidence would show further that Parker had placed the gun under the seat in the taxicab and that Lockett had voluntarily gone to the police station when she learned that the police were looking for the pawnbroker's killers.

Parker was the State's first witness. His testimony related his version of the robbery and shooting, and he admitted to a prior criminal record of breaking and entering, larceny, and receiving stolen goods, as well as bond jumping. He also acknowledged that his plea to aggravated murder had eliminated the possibility of the death penalty, and that he had agreed to testify against Lockett, her brother, and Dew as part of his plea agreement with the prosecutor. At the end of the major portion of Parker's testimony, the prosecutor renewed his offer to permit Lockett to plead guilty to aggravated murder without specifications and to drop the other charges against her. For the third time Lockett refused the option of pleading guilty to a lesser offense.

Lockett called Dew and her brother as defense witnesses, but they invoked their Fifth Amendment rights and refused to testify. In the course of the defense presentation, Lockett's counsel informed the court, in the presence of the jury, that he believed Lockett was to be the next witness and requested a short recess. After the recess, Lockett's counsel told the judge that Lockett wished to testify but had decided to accept her mother's advice to remain silent, despite her counsel's warning that, if she followed that advice, she would have no

defense except the cross-examination of the State's witnesses. Thus, the defense did not introduce any evidence to rebut the prosecutor's case.

The court instructed the jury that, before it could find Lockett guilty, it had to find that she purposely had killed the pawnbroker while committing or attempting to commit aggravated robbery. The jury was further charged that one who

> "purposely aids, helps, associates himself or herself with another for the purpose of committing a crime is regarded as if he or she were the principal offender and is just as guilty as if the person performed every act constituting the offense. . . ."

Regarding the intent requirement, the court instructed:

> "A person engaged in a common design with others to rob by force and violence an individual or individuals of their property is presumed to acquiesce in whatever may reasonably be necessary to accomplish the object of their enterprise. . . .
>
> "If the conspired robbery and the manner of its accomplishment would be reasonably likely to produce death, each plotter is equally guilty with the principal offender as an aider and abettor in the homicide . . . . An intent to kill by an aider and abettor may be found to exist beyond a reasonable doubt under such circumstances."

The jury found Lockett guilty as charged.

Once a verdict of aggravated murder with specifications had been returned, the Ohio death penalty statute required the trial judge to impose a death sentence unless, after "considering the nature and circumstances of the offense" and Lockett's "history, character, and condition," he found by a preponderance of the evidence that (1) the victim had induced or facilitated the offense, (2) it was unlikely that Lockett would have committed the offense but for the fact that she "was under duress, coercion, or strong provocation," or (3) the

offense was "primarily the product of [Lockett's] psychosis or mental deficiency." Ohio Rev. Code §§ 2929.03–2929.04 (B) (1975).

In accord with the Ohio statute, the trial judge requested a presentence report as well as psychiatric and psychological reports. The reports contained detailed information about Lockett's intelligence, character, and background. The psychiatric and psychological reports described her as a 21-year-old with low-average or average intelligence, and not suffering from a mental deficiency. One of the psychologists reported that "her prognosis for rehabilitation" if returned to society was favorable. The presentence report showed that Lockett had committed no major offenses although she had a record of several minor ones as a juvenile and two minor offenses as an adult. It also showed that she had once used heroin but was receiving treatment at a drug abuse clinic and seemed to be "on the road to success" as far as her drug problem was concerned. It concluded that Lockett suffered no psychosis and was not mentally deficient.[2]

After considering the reports and hearing argument on the penalty issue, the trial judge concluded that the offense had not been primarily the product of psychosis or mental deficiency. Without specifically addressing the other two statutory mitigating factors, the judge said that he had "no alternative, whether [he] like[d] the law or not" but to impose the death penalty. He then sentenced Lockett to death.

## II

### A

At the outset, we address Lockett's various challenges to the validity of her conviction. Her first contention is that the

---

[2] The presentence report also contained information about the robbery. It indicated that Dew had told the police that he, Parker, and Lockett's brother had planned the holdup. It also indicated that Parker had told the police that Lockett had not followed his order to keep the car running during the robbery and instead had gone to get something to eat.

prosecutor's repeated references in his closing remarks to the State's evidence as "unrefuted" and "uncontradicted" constituted a comment on her failure to testify and violated her Fifth and Fourteenth Amendment rights. See *Griffin* v. *California,* 380 U. S. 609, 615 (1965). We conclude, however, that the prosecutor's closing comments in this case did not violate constitutional prohibitions. Lockett's own counsel had clearly focused the jury's attention on her silence, first, by outlining her contemplated defense in his opening statement and, second, by stating to the court and jury near the close of the case, that Lockett would be the "next witness." When viewed against this background, it seems clear that the prosecutor's closing remarks added nothing to the impression that had already been created by Lockett's refusal to testify after the jury had been promised a defense by her lawyer and told that Lockett would take the stand.

## B

Lockett also contends that four prospective jurors were excluded from the venire in violation of her Sixth and Fourteenth Amendment rights under the principles established in *Witherspoon* v. *Illinois,* 391 U. S. 510 (1968), and *Taylor* v. *Louisiana,* 419 U. S. 522, 528 (1975). We do not agree.

On *voir dire,* the prosecutor told the venire that there was a possibility that the death penalty might be imposed, but that the judge would make the final decision as to punishment. He then asked whether any of the prospective jurors were so opposed to capital punishment that "they could not sit, listen to the evidence, listen to the law, [and] make their determination solely upon the evidence and the law without considering the fact that capital punishment" might be imposed. Four of the venire responded affirmatively. The trial judge then addressed the following question to those four veniremen:

"[D]o you feel that you could take an oath to well and truely [*sic*] try this case . . . and follow the law, or is

your conviction so strong that you cannot take an oath, knowing that a possibility exists in regard to capital punishment?"

Each of the four specifically stated twice that he or she would not "take the oath." They were excused.

In *Witherspoon,* persons generally opposed to capital punishment had been excluded for cause from the jury that convicted and sentenced the petitioner to death. We did not disturb the conviction but we held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U. S., at 522. We specifically noted, however, that nothing in our opinion prevented the execution of a death sentence when the veniremen excluded for cause make it "unmistakably clear . . . that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt." Id.,* at 522–523, n. 21.

Each of the excluded veniremen in this case made it "unmistakably clear" that they could not be trusted to "abide by existing law" and "to follow conscientiously the instructions" of the trial judge. *Boulden* v. *Holman,* 394 U. S. 478, 484 (1969). They were thus properly excluded under *Witherspoon,* even assuming, *arguendo,* that *Witherspoon* provides a basis for attacking the conviction as well as the sentence in a capital case.

Nor was there any violation of the principles of *Taylor* v. *Louisiana, supra.* In *Taylor,* the Court invalidated a jury selection system that operated to exclude a "grossly disproportionate," 419 U. S., at 525, number of women from jury service thereby depriving the petitioner of a jury chosen from a "fair cross-section" of the community, *id.,* at 530. Nothing in *Taylor,* however, suggests that the right to a representative jury includes the right to be tried by jurors who have explicitly

indicated an inability to follow the law and instructions of the trial judge.

## C

Lockett's final attack on her conviction, as distinguished from her sentence, merits only brief attention. Specifically she contends that the Ohio Supreme Court's interpretation of the complicity provision of the statute under which she was convicted, Ohio Rev. Code Ann. § 2923.03 (A) (1975), was so unexpected that it deprived her of fair warning of the crime with which she was charged. The opinion of the Ohio Supreme Court belies this claim. It shows clearly that the construction given the statute by the Ohio court was consistent with both prior Ohio law and with the legislative history of the statute.[3] In such circumstances, any claim of inadequate notice under the Due Process Clause of the Fourteenth Amendment must be rejected.

## III

Lockett challenges the constitutionality of Ohio's death penalty statute on a number of grounds. We find it necessary to consider only her contention that her death sentence is invalid because the statute under which it was imposed did not permit the sentencing judge to consider, as mitigating factors, her character, prior record, age, lack of specific intent to cause death, and her relatively minor part in the crime. To address her contention from the proper perspective, it is helpful to review the developments in our recent cases where we have applied the Eighth and Fourteenth Amendments to death penalty statutes. We do not write on a "clean slate."

## A

Prior to *Furman* v. *Georgia,* 408 U. S. 238 (1972), every State that authorized capital punishment had abandoned

[3] See 49 Ohio St. 2d 48, 58–62, 358 N. E. 2d 1062, 1070–1072 (1976); *id.,* at 69–70, 358 N. E. 2d, at 1076 (Stern, J., dissenting).

mandatory death penalties,[4] and instead permitted the jury unguided and unrestrained discretion regarding the imposition of the death penalty in a particular capital case.[5] Mandatory death penalties had proved unsatisfactory, as the plurality noted in *Woodson* v. *North Carolina,* 428 U. S. 280, 293 (1976), in part because juries, "with some regularity, disregarded their oaths and refused to convict defendants where a death sentence was the automatic consequence of a guilty verdict."

This Court had never intimated prior to *Furman* that discretion in sentencing offended the Constitution. See *Pennsylvania ex rel. Sullivan* v. *Ashe,* 302 U. S. 51, 55 (1937); *Williams* v. *New York,* 337 U. S. 241, 247 (1949); *Williams* v. *Oklahoma,* 358 U. S. 576, 585 (1959). As recently as *McGautha* v. *California,* 402 U. S. 183 (1971), the Court had specifically rejected the contention that discretion in imposing the death penalty violated the fundamental standards of fairness embodied in Fourteenth Amendment due process, *id.,* at 207–208, and had asserted that States were entitled to assume that "jurors confronted with the truly awesome responsibility of decreeing death for a fellow human [would] act with due regard for the consequences of their decision." *Id.,* at 208.

The constitutional status of discretionary sentencing in capital cases changed abruptly, however, as a result of the separate opinions supporting the judgment in *Furman.* The question in *Furman* was whether "the imposition and carrying out of the death penalty [in the cases before the Court] constitute[d] cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." 408 U. S., at 239. Two Justices concluded that the Eighth Amendment prohibited the death penalty altogether and on that ground voted

---

[4] See *Woodson* v. *North Carolina,* 428 U. S. 280, 291–292, and n. 25 (1976) (opinion of STEWART, POWELL, and STEVENS, JJ.).

[5] See *id.,* at 291–292; *McGautha* v. *California,* 402 U. S. 183, 200 n. 11 (1971).

to reverse the judgments sustaining the death penalties. *Id.,* at 305–306 (BRENNAN, J., concurring); *id.,* at 370–371 (MARSHALL, J., concurring). Three Justices were unwilling to hold the death penalty *per se* unconstitutional under the Eighth and Fourteenth Amendments, but voted to reverse the judgments on other grounds. In separate opinions, the three concluded that discretionary sentencing, unguided by legislatively defined standards, violated the Eighth Amendment because it was "pregnant with discrimination," *id.,* at 257 (Douglas, J., concurring), because it permitted the death penalty to be "wantonly" and "freakishly" imposed, *id.,* at 310 (STEWART, J., concurring), and because it imposed the death penalty with "great infrequency" and afforded "no meaningful basis for distinguishing the few cases in which it [was] imposed from the many cases in which it [was] not," *id.,* at 313 (WHITE, J., concurring). Thus, what had been approved under the Due Process Clause of the Fourteenth Amendment in *McGautha* became impermissible under the Eighth and Fourteenth Amendments by virtue of the judgment in *Furman.* See *Gregg* v. *Georgia,* 428 U. S. 153, 195–196, n. 47 (1976) (opinion of STEWART, POWELL, and STEVENS, JJ.).

Predictably,[6] the variety of opinions supporting the judgment in *Furman* engendered confusion as to what was required in order to impose the death penalty in accord with the Eighth Amendment.[7] Some States responded to what was thought to

---

[6] See *Furman* v. *Georgia,* 408 U. S. 238, 403 (1972) (BURGER, C. J., dissenting).

[7] The limits on the consideration of mitigating factors in Ohio's death penalty statute which Lockett now attacks appear to have been a direct response to *Furman.* Prior to *Furman,* Ohio had begun to revise its system of capital sentencing. The Ohio House of Representatives had passed a bill abandoning the practice of unbridled sentencing discretion and instructing the sentencer to consider a list of aggravating and mitigating circumstances in determining whether to impose the death penalty. The list of mitigating circumstances permitted consideration of any circumstance

be the command of *Furman* by adopting mandatory death penalties for a limited category of specific crimes thus eliminating all discretion from the sentencing process in capital cases.[8]   Other States attempted to continue the practice of individually assessing the culpability of each individual defendant convicted of a capital offense and, at the same time, to comply with *Furman,* by providing standards to guide the sentencing decision.[9]

Four years after *Furman,* we considered Eighth Amendment

---

"tending to mitigate the offense, though failing to establish a defense." See Sub. House Bill 511, 109th Ohio General Assembly § 2929.03 (C) (3), passed by the Ohio House on March 22, 1972; Lehman & Norris, Some Legislative History and Comments on Ohio's New Criminal Code, 23 Cleve. St. L. Rev. 8, 10, 16 (1974).

*Furman* was announced during the Ohio Senate Judiciary Committee's consideration of the Ohio House bill. After *Furman,* the Committee decided to retain the death penalty but to eliminate much of the sentencing discretion permitted by the House bill.   As a result, the Ohio Senate developed the current sentencing procedure which requires the imposition of the death penalty if one of seven specific aggravating circumstances and none of three specific mitigating circumstances is found to exist.   Confronted with what reasonably would have appeared to be the questionable constitutionality of permitting discretionary weighing of mitigating factors after *Furman,* the sponsors of the Ohio House bill were not in a position to mount a strong opposition to the Senate's amendments, see Lehman & Norris, *supra,* at 18–22, and the statute under which Lockett was sentenced was enacted.

[8] See, *e. g., Woodson, supra,* at 300 (opinion of STEWART, POWELL, and STEVENS, JJ.); *Rockwell* v. *Superior Court,* 18 Cal. 3d 420, 446–448, 556 P. 2d 1101, 1116–1118 (1976) (Clark, J., concurring) (account of how California and other States enacted unconstitutional mandatory death penalties in response to *Furman*); *State* v. *Spence,* 367 A. 2d 983, 985–986 (Del. 1976) (Delaware Legislature and court interpreted *Furman* as requiring elimination of all sentencing discretion resulting in an unconstitutional statute); Liebman & Shepard, Guiding Capital Sentencing Discretion Beyond the "Boiler Plate": Mental Disorder as a Mitigating Factor, 66 Geo. L. J. 757, 765 n. 43 (1978).

[9] See Note, Discretion and the Constitutionality of the New Death Penalty Statutes, 87 Harv. L. Rev. 1690, 1690–1710 (1974).

issues posed by five of the post-*Furman* death penalty statutes.[10] Four Justices took the position that all five statutes complied with the Constitution; two Justices took the position that none of them complied. Hence, the disposition of each case varied according to the votes of three Justices who delivered a joint opinion in each of the five cases upholding the constitutionality of the statutes of Georgia, Florida, and Texas, and holding those of North Carolina and Louisiana unconstitutional.

The joint opinion reasoned that, to comply with *Furman,* sentencing procedures should not create "a substantial risk that the death penalty [will] be inflicted in an arbitrary and capricious manner." *Gregg* v. *Georgia, supra,* at 188. In the view of the three Justices, however, *Furman* did not require that all sentencing discretion be eliminated, but only that it be "directed and limited," 428 U. S., at 189, so that the death penalty would be imposed in a more consistent and rational manner and so that there would be a "meaningful basis for distinguishing the . . . cases in which it is imposed from . . . the many cases in which it is not." *Id.,* at 188. The plurality concluded, in the course of invalidating North Carolina's mandatory death penalty statute, that the sentencing process must permit consideration of the "character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death," *Woodson* v. *North Carolina,* 428 U. S., at 304, in order to ensure the reliability, under Eighth Amendment standards, of the determination that "death is the appropriate punishment in a specific case." *Id.,* at 305; see *Roberts (Harry)* v. *Louisiana,* 431 U. S. 633, 637 (1977); *Jurek* v. *Texas,* 428 U. S. 262, 271–272 (1976).

---

[10] *Gregg* v. *Georgia,* 428 U. S. 153 (1976); *Proffitt* v. *Florida,* 428 U. S. 242 (1976); *Jurek* v. *Texas,* 428 U. S. 262 (1976); *Woodson* v. *North Carolina, supra;* and *Roberts (Stanislaus)* v. *Louisiana,* 428 U. S. 325 (1976).

In the last decade, many of the States have been obliged to revise their death penalty statutes in response to the various opinions supporting the judgments in *Furman* and *Gregg* and its companion cases. The signals from this Court have not, however, always been easy to decipher. The States now deserve the clearest guidance that the Court can provide; we have an obligation to reconcile previously differing views in order to provide that guidance.

## B

With that obligation in mind we turn to Lockett's attack on the Ohio statute. Essentially she contends that the Eighth and Fourteenth Amendments require that the sentencer be given a full opportunity to consider mitigating circumstances in capital cases and that the Ohio statute does not comply with that requirement. She relies, in large part, on the plurality opinions in *Woodson, supra,* at 303–305, and *Roberts (Stanislaus)* v. *Louisiana,* 428 U. S. 325, 333–334 (1976), and the joint opinion in *Jurek, supra,* at 271–272, but she goes beyond them.

We begin by recognizing that the concept of individualized sentencing in criminal cases generally, although not constitutionally required, has long been accepted in this country. See *Williams* v. *New York,* 337 U. S., at 247–248; *Pennsylvania ex rel. Sullivan* v. *Ashe,* 302 U. S., at 55. Consistent with that concept, sentencing judges traditionally have taken a wide range of factors into account. That States have authority to make aiders and abettors equally responsible, as a matter of law, with principals, or to enact felony-murder statutes is beyond constitutional challenge. But the definition of crimes generally has not been thought automatically to dictate what should be the proper penalty. See *ibid.; Williams* v. *New York, supra,* at 247–248; *Williams* v. *Oklahoma,* 358 U. S., at 585. And where sentencing discretion is granted, it generally

has been agreed that the sentencing judge's "possession of the fullest information possible concerning the defendant's life and characteristics" is "[h]ighly relevant—*if not essential*— [to the] selection of an appropriate sentence . . . ." *Williams* v. *New York, supra,* at 247 (emphasis added).

The opinions of this Court going back many years in dealing with sentencing in capital cases have noted the strength of the basis for individualized sentencing. For example, Mr. Justice Black, writing for the Court in *Williams* v. *New York, supra,* at 247–248—a capital case—observed that the

> "whole country has traveled far from the period in which the death sentence was an automatic and commonplace result of convictions—even for offenses today deemed trivial."

Ten years later, in *Williams* v. *Oklahoma, supra,* at 585, another capital case, the Court echoed Mr. Justice Black, stating that

> "[i]n discharging his duty of imposing a proper sentence, the sentencing judge is authorized, *if not required,* to consider all of the mitigating and aggravating circumstances involved in the crime." (Emphasis added.)

See also *Furman* v. *Georgia,* 408 U. S., at 245–246 (Douglas, J., concurring); *id.,* at 297–298 (BRENNAN, J., concurring); *id.,* at 339 (MARSHALL, J., concurring); *id.,* at 402–403 (BURGER, C. J., dissenting); *id.,* at 413 (BLACKMUN, J., dissenting); *McGautha* v. *California,* 402 U. S., at 197–203. Most would agree that "the 19th century movement away from mandatory death sentences marked an enlightened introduction of flexibility into the sentencing process." *Furman* v. *Georgia, supra,* at 402 (BURGER, C. J., dissenting).

Although legislatures remain free to decide how much discretion in sentencing should be reposed in the judge or jury in noncapital cases, the plurality opinion in *Woodson,* after

reviewing the historical repudiation of mandatory sentencing in capital cases, 428 U. S., at 289–298, concluded that

> "in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Id.,* at 304.

That declaration rested "on the predicate that the penalty of death is qualitatively different" from any other sentence. *Id.,* at 305. We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed. The mandatory death penalty statute in *Woodson* was held invalid because it permitted *no* consideration of "relevant facets of the character and record of the individual offender or the circumstances of the particular offense." *Id.,* at 304. The plurality did not attempt to indicate, however, which facets of an offender or his offense it deemed "relevant" in capital sentencing or what degree of consideration of "relevant facets" it would require.

We are now faced with those questions and we conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case,[11] not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.[12] We recognize that, in noncapital

---

[11] We express no opinion as to whether the need to deter certain kinds of homicide would justify a mandatory death sentence as, for example, when a prisoner—or escapee—under a life sentence is found guilty of murder. See *Roberts (Harry)* v. *Louisiana,* 431 U. S. 633, 637 n. 5 (1977).

[12] Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.

cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes. The considerations that account for the wide acceptance of individualization of sentences in noncapital cases surely cannot be thought less important in capital cases. Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases. The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases. A variety of flexible techniques—probation, parole, work furloughs, to name a few—and various postconviction remedies may be available to modify an initial sentence of confinement in noncapital cases. The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence.[13]

There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.

---

[13] Sentencing in noncapital cases presents no comparable problems. We emphasize that in dealing with standards for imposition of the death sentence we intimate no view regarding the authority of a State or of the Congress to fix mandatory, minimum sentences for noncapital crimes.

## C

The Ohio death penalty statute does not permit the type of individualized consideration of mitigating factors we now hold to be required by the Eighth and Fourteenth Amendments in capital cases. Its constitutional infirmities can best be understood by comparing it with the statutes upheld in *Gregg, Proffitt,* and *Jurek.*

In upholding the Georgia statute in *Gregg,* JUSTICES STEWART, POWELL, and STEVENS noted that the statute permitted the jury "to consider any aggravating or mitigating circumstances," see *Gregg,* 428 U. S., at 206, and that the Georgia Supreme Court had approved "open and far-ranging argument" in presentence hearings, *id.,* at 203.[14]   Although the Florida statute approved in *Proffitt* contained a list of mitigating factors, six Members of this Court assumed, in approving the statute, that the range of mitigating factors listed in the statute was not exclusive.[15]   *Jurek* involved a Texas statute which made no explicit reference to mitigating factors. 428 U. S., at 272.   Rather, the jury was required to answer three

---

[14] The statute provided that, in sentencing, the jury should consider "any mitigating circumstances or aggravating circumstances otherwise authorized by law" in addition to 10 specified aggravating circumstances. See Ga. Code Ann. § 27.2534.1 (b) (Supp. 1975). MR. JUSTICE WHITE, who also voted to uphold the statute in an opinion joined by THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST, noted that the Georgia Legislature had decided to permit "the jury to dispense mercy on the basis of factors too intangible to write into a statute." *Gregg,* 428 U. S., at 222.

[15] The opinion of JUSTICES STEWART, POWELL, and STEVENS in *Proffitt* noted that the Florida statute "provides that '[a]ggravating circumstances shall be *limited* to . . . [eight specified factors]' " and that there was "no such limiting language introducing the list of statutory mitigating factors." 428 U. S., at 250 n. 8. MR. JUSTICE WHITE, joined by THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST, accepted the interpretation of the statute contained in the opinion of JUSTICES STEWART, POWELL, and STEVENS. See *id.,* at 260.

questions in the sentencing process, the second of which was "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc., Art. 37.071 (b) (Supp. 1975–1976); see 428 U. S., at 269. The statute survived the petitioner's Eighth and Fourteenth Amendment attack because three Justices concluded that the Texas Court of Criminal Appeals had broadly interpreted the second question—despite its facial narrowness—so as to permit the sentencer to consider "whatever mitigating circumstances" the defendant might be able to show. *Id.*, at 272–273 (opinion of STEWART, POWELL, and STEVENS, JJ.), citing and quoting, *Jurek* v. *State,* 522 S. W. 2d 934, 939–940 (Tex. Crim. App. 1975). None of the statutes we sustained in *Gregg* and the companion cases clearly operated at that time to prevent the sentencer from considering any aspect of the defendant's character and record or any circumstances of his offense as an independently mitigating factor.

In this regard the statute now before us is significantly different. Once a defendant is found guilty of aggravated murder with at least one of seven specified aggravating circumstances, the death penalty must be imposed unless, considering "the nature and circumstances of the offense and the history, character, and condition of the offender," the sentencing judge determines that at least one of the following mitigating circumstances is established by a preponderance of the evidence:

"(1) The victim of the offense induced or facilitated it.

"(2) It is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation.

"(3) The offense was primarily the product of the offender's psychosis or mental deficiency, though such condition is insufficient to establish the defense of insanity." Ohio Rev. Code Ann. § 2929.04 (B) (1975).

The Ohio Supreme Court has concluded that there is no constitutional distinction between the statute approved in *Proffitt* and Ohio's statute, see *State* v. *Bayless,* 48 Ohio St. 2d 73, 86–87, 357 N. E. 2d 1035, 1045–1046 (1976), because the mitigating circumstances in Ohio's statute are "liberally construed in favor of the accused," *State* v. *Bell,* 48 Ohio St. 2d 270, 281, 358 N. E. 2d 556, 564 (1976); see *State* v. *Bayless, supra,* at 86, 357 N. E. 2d, at 1046, and because the sentencing judge or judges may consider factors such as the age and criminal record of the defendant in determining whether any of the mitigating circumstances is established, *State* v. *Bell, supra,* at 281, 358 N. E. 2d, at 564. But even under the Ohio court's construction of the statute, only the three factors specified in the statute can be considered in mitigation of the defendant's sentence. See, 48 Ohio St. 2d, at 281–282, 358 N. E. 2d, at 564–565; *State* v. *Bayless, supra,* at 87 n. 2, 357 N. E. 2d, at 1046 n. 2. We see, therefore, that once it is determined that the victim did not induce or facilitate the offense, that the defendant did not act under duress or coercion, and that the offense was not primarily the product of the defendant's mental deficiency, the Ohio statute mandates the sentence of death. The absence of direct proof that the defendant intended to cause the death of the victim is relevant for mitigating purposes only if it is determined that it sheds some light on one of the three statutory mitigating factors. Similarly, consideration of a defendant's comparatively minor role in the offense, or age, would generally not be permitted, as such, to affect the sentencing decision.

The limited range of mitigating circumstances which may be considered by the sentencer under the Ohio statute is incompatible with the Eighth and Fourteenth Amendments. To meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors.

Accordingly, the judgment under review is reversed to the

extent that it sustains the imposition of the death penalty, and the case is remanded for further proceedings.[16]

*So ordered.*

MR. JUSTICE BRENNAN took no part in the consideration or decision of this case.

## APPENDIX TO OPINION OF THE COURT

The pertinent provisions of the Ohio death penalty statute, Ohio Rev. Code Ann. (1975), are as follows:

§ 2929.03 Imposing sentence for a capital offense.

(A) If the indictment or count in the indictment charging aggravated murder contains no specification of an aggravating circumstance listed in division (A) of section 2929.04 of the Revised Code, then, following a verdict of guilty of the charge, the trial court shall impose sentence of life imprisonment on the offender.

(B) If the indictment or count in the indictment charging aggravated murder contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, the verdict shall separately state whether the accused is found guilty or not guilty of the principal charge and, if guilty of the principal charge, whether the offender is guilty or not

---

[16] In view of our holding that Lockett was not sentenced in accord with the Eighth Amendment, we need not address her contention that the death penalty is constitutionally disproportionate for one who has not been proved to have taken life, to have attempted to take life, or to have intended to take life, or her contention that the death penalty is disproportionate as applied to her in this case. Nor do we address her contentions that the Constitution requires that the death sentence be imposed by a jury; that the Ohio statutory procedures impermissibly burden the defendant's exercise of his rights to plead not guilty and to be tried by a jury; and that it violates the Constitution to require defendants to bear the risk of nonpersuasion as to the existence of mitigating circumstances in capital cases.

guilty of each specification. The jury shall be instructed on its duties in this regard, which shall include an instruction that a specification must be proved beyond a reasonable doubt in order to support a guilty verdict on such specification, but such instruction shall not mention the penalty which may be the consequence of a guilty or not guilty verdict on any charge or specification.

(C) If the indictment or count in the indictment charging aggravated murder contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, then, following a verdict of guilty of the charge but not guilty of each of the specifications, the trial court shall impose sentence of life imprisonment on the offender. If the indictment contains one or more specifications listed in division (A) of such section, then, following a verdict of guilty of both the charge and one or more of the specifications, the penalty to be imposed on the offender shall be determined:

(1) By the panel of three judges which tried the offender upon his waiver of the right to trial by jury;

(2) By the trial judge, if the offender was tried by jury.

(D) When death may be imposed as a penalty for aggravated murder, the court shall require a pre-sentence investigation and a psychiatric examination to be made, and reports submitted to the court, pursuant to section 2947.06 of the Revised Code. Copies of the reports shall be furnished to the prosecutor and to the offender or his counsel. The court shall hear testimony and other evidence, the statement, if any, of the offender, and the arguments, if any, of counsel for the defense and prosecution, relevant to the penalty which should be imposed on the offender. If the offender chooses to make a state-

ment, he is subject to cross-examination only if he consents to make such statement under oath or affirmation.

(E) Upon consideration of the reports, testimony, other evidence, statement of the offender, and arguments of counsel submitted to the court pursuant to division (D) of this section, if the court finds, or if the panel of three judges unanimously finds that none of the mitigating circumstances listed in division (B) of section 2929.04 of the Revised Code is established by a preponderance of the evidence, it shall impose sentence of death on the offender. Otherwise, it shall impose sentence of life imprisonment on the offender.

§ 2929.04 Criteria for imposing death or imprisonment for a capital offense.

(A) Imposition of the death penalty for aggravated murder is precluded, unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code, and is proved beyond a reasonable doubt:

(1) The offense was the assassination of the president of the United States or person in line of succession to the presidency, or of the governor or lieutenant governor of this state, or of the president-elect or vice president-elect of the United States, or of the governor-elect or lieutenant governor-elect of this state, or of a candidate for any of the foregoing offices. For purposes of this division, a person is a candidate if he has been nominated for election according to law, or if he has filed a petition or petitions according to law to have his name placed on the ballot in a primary or general election, or if he campaigns as a write-in candidate in a primary or general election.

(2) The offense was committed for hire.

(3) The offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender.

(4) The offense was committed while the offender was a prisoner in a detention facility as defined in section 2921.01 of the Revised Code.

(5) The offender has previously been convicted of an offense of which the gist was the purposeful killing of or attempt to kill another, committed prior to the offense at bar, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender.

(6) The victim of the offense was a law enforcement officer whom the offender knew to be such, and either the victim was engaged in his duties at the time of the offense, or it was the offender's specific purpose to kill a law enforcement officer.

(7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary.

(B) Regardless of whether one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment and proved beyond a reasonable doubt, the death penalty for aggravated murder is precluded when, considering the nature and circumstances of the offense and the history, character, and condition of the offender, one or more of the following is established by a prepondence [preponderance] of the evidence:

(1) The victim of the offense induced or facilitated it.

(2) It is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation.

(3) The offense was primarily the product of the offender's psychosis or mental deficiency, though such

condition is insufficient to establish the defense of insanity.

MR. JUSTICE BLACKMUN, concurring in part and concurring in the judgment.

I join the Court's judgment, but only Parts I and II of its opinion. I, too, would reverse the judgment of the Supreme Court of Ohio insofar as it upheld the imposition of the death penalty on petitioner Sandra Lockett, but I would do so for a reason more limited than that which the plurality espouses, and for an additional reason not relied upon by the plurality.

I

The first reason is that, in my view, the Ohio judgment in this case improperly provided the death sentence for a defendant who only aided and abetted a murder, without permitting any consideration by the sentencing authority of the extent of her involvement, or the degree of her *mens rea*, in the commission of the homicide. The Ohio capital penalty statute, together with that State's aiding-and-abetting statute, and its statutory definition of "purposefulness" as including reckless endangerment, allows for a particularly harsh application of the death penalty to any defendant who has aided or abetted the commission of an armed robbery in the course of which a person is killed, even though accidentally.[1] It might be that

---

[1] Ohio Rev. Code Ann. § 2903.01 (B) (1975) provides that "[n]o person shall purposely cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit . . . aggravated robbery," and § 2903.01 (C) states that one doing so is guilty of aggravated murder. Under § 2929.04 (A) (7), the commission of the same armed robbery serves as an aggravating specification to the murder and requires the imposition of the death penalty upon the principal offender unless the existence of one of the three permitted mitigating circumstances is established by a preponderance of the evidence. Sections 2923.03 (A) and (F) provide that an aider or abettor who acts "with the kind of culpability required for the commission

to inflict the death penalty in some such situations would skirt the limits of the Eighth Amendment proscription, incorporated in the Fourteenth Amendment, against gross disproportionality, but I doubt that the Court, in regard to murder, could easily define a convincing bright-line rule such as was used in regard to rape, *Coker* v. *Georgia,* 433 U. S. 584 (1977), to make workable a disproportionality approach.[2]

---

of [the principal] offense" shall be "prosecuted and punished as if he were a principal offender." The finishing stroke is then delivered by Ohio's statutory definition of "purpose." Under § 2901.22 (A), "[a] person acts purposely when it is his specific intention to cause a certain result, or, *when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."* (Emphasis added.)

In this case, as the three dissenting justices of the Ohio Supreme Court noted, 49 Ohio St. 2d 48, 68, 358 N. E. 2d 1062, 1075 (1976), the jury was instructed that Lockett could be found to have "purposely" aided a murder merely by taking part in a robbery in which the threat of force was to be employed. The jury was instructed: "If the conspired robbery and the manner of its accomplishment would be reasonably likely to produce death, each plotter is equally guilty with the principal offender as an aider and abettor in the homicide, even though the aider and abettor was not aware of the particular weapon used to accomplish the killing."

The State presented no testimony indicating any prior plan actually to fire the gun in the course of the robbery. The triggerman, Parker, testified that the gun discharged accidentally when the proprietor of the pawnshop grabbed at it. App. 50–51, 53.

[2] I do not find entirely convincing the disproportionality rule embraced by my Brother WHITE. The rule that a defendant must have had actual intent to kill, in order to be capitally sentenced, does not explain why such intent is the sole criterion of culpability for Eighth Amendment purposes. What if a defendant personally commits the act proximately causing death by pointing a loaded gun at the robbery victim, verbally threatens to use fatal force, admittedly does not intend to cause a death, yet knowingly creates a high probability that the gun will discharge accidentally? What if a robbery participant, in order to avoid capture or even for wanton sport, personally and deliberately uses grave physical force with conscious intent to inflict serious bodily harm, but not to kill, and a death results?

The more manageable alternative, in my view, is to follow a proceduralist tack, and require, as Ohio does not, in the case of a nontriggerman such as Lockett, that the sentencing au-

---

May we as judges say that for Eighth Amendment purposes the absence of a "conscious purpose of producing death," *post,* at 628, transforms the culpability of those defendants' actions?

Applying a requirement of actual intent to kill to defendants not immediately involved in the physical act causing death, moreover, would run aground on intricate definitional problems attending a felony murder. What intention may a State attribute to a robbery participant who sits in the getaway car, knows that a loaded gun will be brandished by his companion in the robbery inside the store, is willing to have the gun fired if necessary to make an escape but not to accomplish the robbery, when the victim is shot by the companion even though not necessary for escape? What if the unarmed participant stands immediately inside the store as a lookout, intends that a loaded gun merely be brandished, but never bothered to discuss with the triggerman what limitations were appropriate for the firing of the gun? What if the same lookout personally intended that the gun never be fired, but, after his companion fires a fatal shot to prevent the victim from sounding an alarm, approves and takes off?

The requirement of actual intent to kill in order to inflict the death penalty would require this Court to impose upon the States an elaborate "constitutionalized" definition of the requisite *mens rea,* involving myriad problems of line drawing that normally are left to jury discretion but that, in disproportionality analysis, have to be decided as issues of law, and interfering with the substantive categories of the States' criminal law. And such a rule, even if workable, is an incomplete method of ascertaining culpability for Eighth Amendment purposes, which necessarily is a more subtle mixture of action, inaction, and degrees of *mens rea.*

Finally, I must question the data relied upon by my Brother WHITE in concluding, *post,* at 624, that only "extremely rare[ly]" has the death penalty been used when a defendant did not specifically intend the death of the victim. The representation made by petitioner Lockett, even if accepted uncritically, was merely that of 363 reported cases involving executions from 1954 to 1976, in 347 the defendant "personally committed a homicidal assault"—not that the defendant had actual intention to kill. App. to Brief for Petitioner 1b. Of contemporary death penalty statutes, my Brother WHITE concedes that approximately half permit the execution of persons who did not actually intend to cause death.

616

thority have discretion to consider the degree of the defendant's participation in the acts leading to the homicide and the character of the defendant's *mens rea*. That approach does not interfere with the States' individual statutory categories for assessing legal guilt, but merely requires that the sentencing authority be permitted to weigh any available evidence, adduced at trial or at the sentencing hearing, concerning the defendant's degree of participation in the homicide and the nature of his *mens rea* in regard to the commission of the homicidal act. A defendant would be permitted to adduce evidence, if any be available, that he had little or no reason to anticipate that a gun would be fired, or that he played only a minor part in the course of events leading to the use of fatal force. Though heretofore I have been unwilling to interfere with the legislative judgment of the States in regard to capital-sentencing procedures, see *Furman* v. *Georgia,* 408 U. S. 238, 405 (1972) (dissenting opinion), adhered to in the 1976 cases, see my opinions in *Gregg* v. *Georgia,* 428 U. S. 153, 227; *Proffitt* v. *Florida,* 428 U. S. 242, 261; *Jurek* v. *Texas,* 428 U. S. 262, 279; *Woodson* v. *North Carolina,* 428 U. S. 280, 307; *Roberts* v. *Louisiana,* 428 U. S. 325, 363, this Court's judgment as to disproportionality in *Coker, supra,* in which I joined, and the unusual degree to which Ohio requires capital punishment of a mere aider and abettor in an armed felony resulting in a fatality even where *no* participant specifically intended the fatal use of a weapon, see n. 1, *supra,* provides a significant occasion for setting some limit to the method by which the States assess punishment for actions less immediately connected to the deliberate taking of human life.

This approach is not too far off the mark already used by many States in assessing the death penalty. Of 34 States that now have capital statutes, 18 specify that a minor degree of participation in a homicide may be considered by the sentenc-

ing authority, and, of the remaining 16 States, 9 allow consideration of any mitigating factor.[3]

## II

The second ground on which reversal is required, in my view, is a *Jackson* issue. Although the plurality does not reach this issue, it is raised by petitioner, and I mention it against the possibility that any further revision of the Ohio death penalty statutes, prompted by the Court's decision today, contemplate as well, and cure, the *Jackson* deficiency.

In *United States* v. *Jackson*, 390 U. S. 570 (1968), the Court held that the capital-sentencing provision of the Federal Kidnaping Act was unconstitutional in that it needlessly burdened the defendant's exercise of the Sixth Amendment

---

[3] The 18 state statutes specifically permitting consideration of a defendant's minor degree of involvement are Ala. Code, Tit. 13, § 13–11–7 (4) (1975); Ariz. Rev. Stat. Ann. § 13–454 (F)(3) (Supp. 1977); Ark. Stat. Ann. § 41–1304 (5) (1977); Cal. Penal Code Ann. § 190.3 (i) (West Supp. 1978); Fla. Stat. § 921.141 (6)(d) (Supp. 1978); Ind. Code § 35–50–2–9 (c)(4) (Supp. 1977); Ky. Rev. Stat. § 532.025 (2)(b)(5) (Supp. 1977); La. Code Crim. Proc., Art. 905.5 (g) (West Supp. 1978); Mo. Rev. Stat. § 565.012.3 (4) (Supp. 1978); Mont. Rev. Codes Ann. § 95–2206.9 (6) (Supp. 1977); Neb. Rev. Stat. § 29–2523 (2)(e) (1975); Nev. Rev. Stat. § 200.035 (4) (1977); N. C. Gen. Stat. § 15A–2000 (f)(4) (Supp. 1977), added by 1977 N. C. Sess. Laws, ch. 406; S. C. Code § 16–3–20 (C)(b)(4) (Supp. 1978); Tenn. Code Ann. § 39–2404 (j)(5) (Supp. 1977); Utah Code Ann. § 76–3–207 (1)(f) (Supp. 1977); Wash. Rev. Code § 9A.32.045 (2)(d) (Supp. 1977); Wyo. Stat. §§ 6–54.2 (c), (d), and (j)(iv) (Supp. 1977), added by 1977 Wyo. Sess. Laws, ch. 122.

The nine state statutes allowing consideration of any mitigating circumstance are Del. Code Ann., Tit. 11, § 4209 (c) (Supp. 1977); Ga. Code § 27–2534.1 (b) (1975); Idaho Code § 19–2515 (c) (Supp. 1977); Ill. Rev. Stat., ch. 38, § 9–1 (c) (Supp. 1978); Miss. Code Ann. § 97–3–21 (Supp. 1977), see *Jackson* v. *State*, 337 So. 2d 1242, 1254 (Miss. 1976); N. H. Rev. Stat. Ann. § 630:5 (II) (Supp. 1977); Okla. Stat., Tit. 21, § 701.10 (Supp. 1977); Tex. Code Crim. Proc. Ann., Art. 37.071 (b)(2) (Vernon Supp. 1978), see *Jurek* v. *Texas*, 428 U. S. 262, 272–273 (1976); Va. Code § 19.2–264.4 (B) (Supp. 1977).

right to trial by jury and the Fifth Amendment right to plead not guilty. The Act, 18 U. S. C. § 1201 (a) (1964 ed.), had provided that the death penalty could be imposed only "if the verdict of the jury shall so recommend," thus peculiarly insuring that any defendant who pleaded guilty, or who waived a jury trial in favor of a bench trial, could not be sentenced to death, and imposing the risk of death only on those who insisted on trial by jury.

The holding of *Jackson,* prohibiting imposition of the death penalty on a defendant who insists upon a jury trial, was thereafter limited to an extent by *Brady* v. *United States,* 397 U. S. 742 (1970), where the Court held that a pre-*Jackson* defendant who had pleaded guilty rather than go to trial was not entitled to withdraw his plea on grounds of involuntariness or coercion even if the plea had been encouraged by fear of the death penalty in a jury trial. Here, of course, petitioner insisted on her right to a jury trial, and thus falls on the *Jackson* side of any *Jackson-Brady* dichotomy.

Under Ohio Rule Crim. Proc. 11 (C)(3), the sentencing court has full discretion to prevent imposition of a capital sentence "in the interests of justice" *if* a defendant pleads guilty or no contest, but wholly lacks such discretion if the defendant goes to trial. The Rule states that if "the indictment contains one or more specifications [of aggravating circumstances], and a plea of guilty or no contest to the charge [of aggravated murder with specifications] is accepted, the court may dismiss the specifications and impose sentence [of life imprisonment] accordingly, in the interests of justice." Such a dismissal of aggravating specifications absolutely precludes imposition of the death penalty. There is *no* provision similar to Rule 11 (C)(4) permitting the trial court to dismiss aggravating specifications "in the interests of justice" where the defendant insists on his right to trial. Instead, as the Ohio Supreme Court noted in *State* v. *Weind,* 50 Ohio St. 2d 224, 227, 364 N. E. 2d 224, 228 (1977), vacated in part and remanded, *post,* p. 911, a defendant who pleads not guilty

"must rely on the court finding the presence of one of the [statutory] mitigating circumstances . . . to avoid the death sentence."

While it is true, as the Ohio Court noted in *Weind,* 50 Ohio St. 2d, at 229, 364 N. E. 2d, at 229, that there is always a possibility of a death sentence whether or not one pleads guilty, this does not change the fact that a defendant can plead not guilty only by enduring a semimandatory, rather than a purely discretionary, capital-sentencing provision. This disparity between a defendant's prospects under the two sentencing alternatives is, in my view, too great to survive under *Jackson,* and petitioner's death sentence thus should be vacated on that ground as well.

MR. JUSTICE MARSHALL, concurring in the judgment.

I continue to adhere to my view that the death penalty is, under all circumstances, a cruel and unusual punishment prohibited by the Eighth Amendment. See *Furman* v. *Georgia,* 408 U. S. 238, 314–374 (1972) (MARSHALL, J., concurring); *Gregg* v. *Georgia,* 428 U. S. 153, 231–241 (1976) (MARSHALL, J., dissenting). The cases that have come to this Court since its 1976 decisions permitting imposition of the death penalty have only persuaded me further of that conclusion. See, *e. g., Gardner* v. *Florida,* 430 U. S. 349, 365 (1977) (MARSHALL, J., dissenting); *Coker* v. *Georgia,* 433 U. S. 584, 600–601 (1977) (MARSHALL, J., concurring in judgment); *Alford* v. *Florida,* 436 U. S. 935 (1978) (MARSHALL, J., dissenting from denial of certiorari). This case, as well, serves to reinforce my view.

When a death sentence is imposed under the circumstances presented here, I fail to understand how any of my Brethren—even those who believe that the death penalty is not wholly inconsistent with the Constitution—can disagree that it must be vacated. Under the Ohio death penalty statute, this 21-year-old Negro woman was sentenced to death for a killing that she did not actually commit or intend to commit. She was convicted under a theory of vicarious liability. The imposi-

tion of the death penalty for this crime totally violates the principle of proportionality embodied in the Eighth Amendment's prohibition, *Weems* v. *United States,* 217 U. S. 349 (1910); it makes no distinction between a willful and malicious murderer and an accomplice to an armed robbery in which a killing unintentionally occurs. See 49 Ohio St. 2d 48, 67, 358 N. E. 2d 1062, 1075 (1976) (dissenting opinion).

Permitting imposition of the death penalty solely on proof of felony murder, moreover, necessarily leads to the kind of "lightning bolt," "freakish," and "wanton" executions that persuaded other Members of the Court to join MR. JUSTICE BRENNAN and myself in *Furman* v. *Georgia, supra,* in holding Georgia's death penalty statute unconstitutional. Whether a death results in the course of a felony (thus giving rise to felony-murder liability) turns on fortuitous events that do not distinguish the intention or moral culpability of the defendants. That the State of Ohio chose to permit imposition of the death penalty under a purely vicarious theory of liability seems to belie the notion that the Court can discern the "evolving standards of decency," *Trop* v. *Dulles,* 356 U. S. 86, 101 (1958) (plurality opinion), embodied in the Eighth Amendment, by reference to state "legislative judgment," see *Gregg* v. *Georgia, supra,* at 175 (opinion of STEWART, POWELL, and STEVENS, JJ.).

As the plurality points out, petitioner was sentenced to death under a statutory scheme that precluded any effective consideration of her degree of involvement in the crime, her age, or her prospects for rehabilitation. Achieving the proper balance between clear guidelines that assure relative equality of treatment, and discretion to consider individual factors whose weight cannot always be preassigned, is no easy task in any sentencing system. Where life itself is what hangs in the balance, a fine precision in the process must be insisted upon. The Ohio statute, with its blunderbuss, virtually mandatory approach to imposition of the death penalty for certain crimes,

wholly fails to recognize the unique individuality of every criminal defendant who comes before its courts.  See *Roberts (Harry)* v. *Louisiana,* 431 U. S. 633, 637 (1977) (*per curiam*); *Woodson* v. *North Carolina,* 428 U. S. 280, 304 (1976).

The opinions announcing the judgment of the Court in *Gregg* v. *Georgia,* 428 U. S., at 188–198 (opinion of STEWART, POWELL, and STEVENS, JJ.), *Jurek* v. *Texas,* 428 U. S. 262, 271–276 (1976) (opinion of STEWART, POWELL, and STEVENS, JJ.), and *Proffitt* v. *Florida,* 428 U. S. 242, 259–260 (1976) (opinion of STEWART, POWELL, and STEVENS, JJ.), upheld the constitutionality of the death penalty, in the belief that a system providing sufficient guidance for the sentencing decisionmaker and adequate appellate review would assure "rationality," "consistency," and "proportionality" in the imposition of the death sentence.  *Gregg* v. *Georgia, supra,* at 203; *Proffitt* v. *Florida, supra,* at 259; *Jurek* v. *Texas, supra,* at 276.  That an Ohio trial court could impose the death penalty on petitioner under these facts, and that the Ohio Supreme Court on review could sustain it, cast strong doubt on the plurality's premise that appellate review in state systems is sufficient to avoid the wrongful and unfair imposition of this irrevocable penalty.

Accordingly, I join in the Court's judgment insofar as it affirms petitioner's conviction and vacates her death sentence. I do not, however, join in the Court's assumption that the death penalty may ever be imposed without violating the command of the Eighth Amendment that no "cruel and unusual punishments" be imposed.

MR. JUSTICE WHITE, concurring in part, dissenting in part, and concurring in the judgments of the Court.*

I concur in Parts I and II of the Court's opinion in *Lockett* v. *Ohio,* and Part I of the Court's opinion in *Bell* v. *Ohio, post,* p. 637 and in the judgments.  I cannot, however, agree with

---

*[This opinion applies also to No. 76–6513, *Bell* v. *Ohio, post,* p. 637.]

Part III of the plurality opinion in *Lockett* and Part II of the plurality opinion in *Bell* and to that extent respectfully dissent.

## I

The Court has now completed its about-face since *Furman* v. *Georgia,* 408 U. S. 238 (1972). *Furman* held that as a result of permitting the sentencer to exercise unfettered discretion to impose or not to impose the death penalty for murder, the penalty was then being imposed discriminatorily,[1] wantonly and freakishly,[2] and so infrequently[3] that any given death sentence was cruel and unusual. The Court began its retreat in *Woodson* v. *North Carolina,* 428 U. S. 280 (1976), and *Roberts (Stanislaus)* v. *Louisiana,* 428 U. S. 325 (1976), where a plurality held that statutes which imposed mandatory death sentences even for first-degree murders were constitutionally invalid because the Eighth Amendment required that consideration be given by the sentencer to aspects of character of the individual offender and the circumstances of the particular offense in deciding whether to impose the punishment of death.[4] Today it is held, again through a plurality, that the sentencer may constitutionally impose the death penalty only as an exercise of his unguided discretion after being presented with all circumstances which the defendant might believe to be conceivably relevant to the appropriateness of the penalty for the individual offender.[5]

---

[1] See *Furman* v. *Georgia,* 408 U. S., at 240 (Douglas, J., concurring).

[2] See *id.,* at 306 (STEWART, J., concurring).

[3] See *id.,* at 310 (WHITE, J., concurring).

[4] The Court took a further step along this path in *Roberts (Harry)* v. *Louisiana,* 431 U. S. 633 (1977), which held that the imposition of a mandatory death sentence even upon one convicted of the first-degree murder of a police officer engaged in the performance of his duties constituted cruel and unusual punishment.

[5] The plurality's general endorsement of individualized sentencing as representing enlightened public policy even apart from the Eighth Amend-

With all due respect, I dissent. I continue to be of the view, for the reasons set forth in my dissenting opinion in *Roberts, supra,* at 337, that it does not violate the Eighth Amendment for a State to impose the death penalty on a mandatory basis when the defendant has been found guilty beyond a reasonable doubt of committing a deliberate, unjustified killing. Moreover, I greatly fear that the effect of the Court's decision today will be to compel constitutionally a restoration of the state of affairs at the time *Furman* was decided, where the death penalty is imposed so erratically and the threat of execution is so attenuated for even the most atrocious murders that "its imposition would then be the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes." *Furman* v. *Georgia, supra,* at 312 (WHITE, J., concurring). By requiring as a matter of constitutional law that sentencing authorities be permitted to consider and in their discretion to act upon any and all mitigating circumstances, the Court permits them to refuse to impose the death penalty no matter what the circumstances of the crime. This invites a return to the pre-*Furman* days when the death penalty was generally reserved for those very few for whom society has least consideration. I decline to extend *Woodson* and *Roberts* in this respect.

It also seems to me that the plurality strains very hard and unsuccessfully to avoid eviscerating the handiwork in *Proffitt* v. *Florida,* 428 U. S. 242 (1976), and *Jurek* v. *Texas,* 428 U. S. 262 (1976); and surely it calls into question any other death penalty statute that permits only a limited num-

---

ment context, *ante,* at 602–603, is not only questionable but also highly inappropriate in light of the fact that Congress, after detailed study of the matter, is currently giving serious consideration to legislation adopting the view that the goals of the criminal law are best achieved by a system of sentencing which narrowly limits the discretion of the sentencer. See S. 1437, 95th Cong., 2d Sess. (approved by the Senate on Jan. 30, 1978).

ber of mitigating circumstances to be placed before the sentencing authority or to be used in its deliberations.

## II

I nevertheless concur in the judgments of the Court reversing the imposition of the death sentences because I agree with the contention of the petitioners, ignored by the plurality, that it violates the Eighth Amendment to impose the penalty of death without a finding that the defendant possessed a purpose to cause the death of the victim.

It is now established that a penalty constitutes cruel and unusual punishment if it is excessive in relation to the crime for which it is imposed. A punishment is disproportionate "if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime. A punishment might fail the test on either ground." *Coker* v. *Georgia*, 433 U. S. 584, 592 (1977) (opinion of WHITE, J.). Because it has been extremely rare that the death penalty has been imposed upon those who were not found to have intended the death of the victim, the punishment of death violates both tests under the circumstances present here.

According to the factual submissions before this Court, out of 363 reported executions for homicide since 1954 for which facts are available only eight clearly involved individuals who did not personally commit the murder.[6] Moreover, at least some of these eight executions involved individuals who in-

---

[6] The study is based upon reported appellate opinions. There were eight additional cases in which the facts were not reported in sufficient detail to permit a determination as to the status of the executed person. I recognize that because of the absence of reported appellate opinions for some cases this study does not include all executions within the relevant time period. There is no reason whatsoever to suppose, however, that the statistics relevant to these executions would alter the conclusions to be drawn from those included in the study.

tended to cause the death of the victim.[7]  Furthermore, the last such execution occurred in 1955.  In contrast, there have been 72 executions for rape in the United States since 1954.[8]

I recognize that approximately half of the States have not legislatively foreclosed the possibility of imposing the death penalty upon those who do not intend to cause death.  The ultimate judgment of the American people concerning the imposition of the death penalty upon such defendants, however, is revealed not only by the content of statutes and by the imposition of capital sentences but also by the frequency with which society is prepared actually to inflict the punishment of death.  See *Furman* v. *Georgia,* 408 U. S. 238 (1972).  It is clear from recent history that the infliction of death under circumstances where there is no purpose to take life has been widely rejected as grossly out of proportion to the seriousness of the crime.

The value of capital punishment as a deterrent to those lacking a purpose to kill is extremely attenuated.  Whatever questions may be raised concerning the efficacy of the death penalty as a deterrent to intentional murders—and that debate rages on—its function in deterring individuals from becoming involved in ventures in which death may unintentionally result is even more doubtful.  Moreover, whatever legitimate purposes the imposition of death upon those who do not intend to cause death might serve if inflicted with any regularity is surely dissipated by society's apparent unwillingness to impose it upon other than an occasional and erratic basis.  See *id.,* at 310 (WHITE, J., concurring).

---

[7] In two of these cases the executed person arranged for another to commit the murder for him.  I realize that it may be conceivable that a few of the "triggermen" actually executed lacked an intent to kill.  But such cases will of necessity be rare.

[8] U. S. Department of Justice, Law Enforcement Assistance Administration, National Prisoner Statistics Bulletin No. SD–NPS–CP–3, Capital Punishment 1974, pp. 16–17 (Nov. 1975).

Under those circumstances the conclusion is unavoidable that the infliction of death upon those who had no intent to bring about the death of the victim is not only grossly out of proportion to the severity of the crime but also fails to contribute significantly to acceptable or, indeed, any perceptible goals of punishment.

This is not to question, of course, that those who engage in serious criminal conduct which poses a substantial risk of violence, as did the present petitioners, deserve serious punishment regardless of whether or not they possess a purpose to take life. And the fact that death results, even unintentionally, from a criminal venture need not and frequently is not regarded by society as irrelevant to the appropriate degree of punishment. But society has made a judgment, which has deep roots in the history of the criminal law, see *United States* v. *United States Gypsum Co., ante,* p. 422, distinguishing at least for purpose of the imposition of the death penalty between the culpability of those who acted with and those who acted without a purpose to destroy human life.

Both of these petitioners were sentenced to death without a finding at any stage of the proceeding that they intended the death of those who were killed as a result of their criminal conduct. In *Lockett* v. *Ohio,* the trial judge instructed the jury as follows:

> "A person engaged in a common design with others to rob by force and violence an individual or individuals of their property is presumed to acquiesce in whatever may reasonably be necessary to accomplish the object of their enterprise. . . .
>
> "If the conspired robbery and the manner of its accomplishment would be reasonably likely to produce death, each plotter is equally guilty with the principal offender as an aider and abettor in the homicide . . . . An intent to kill by an aider and abettor may be

found to exist beyond a reasonable doubt under such circumstances."

On appeal, the Ohio Supreme Court held that where "it might be reasonably expected by all the participants that the victim's life would be endangered by the manner and means of performing the act conspired . . . participants [are] bound by all the consequences naturally and probably arising from the furtherance of the conspiracy to commit the robbery." 49 Ohio St. 2d 48, 62, 358 N. E. 2d 1062, 1072 (1976). It is thus clear that under Ohio law a defendant may be convicted of aggravated murder with aggravating specifications and sentenced to death without a finding that he intended death to result but only that he engaged in criminal conduct which posed a substantial risk of death to others. Moreover, it appears that nowhere during either the trial or sentencing process was any finding made that Lockett intended that death be inflicted in connection with the robbery. The petitioner in *Bell* v. *Ohio, post,* p. 637, was tried before a three-judge panel. Again, however, no findings were made either during the trial or sentencing stage of the process that Bell intended the death of the victim which resulted from the criminal conduct in which he was engaged.

Of course, the facts of both of these cases might well permit the inference that the petitioners did in fact intend the death of the victims. But there is a vast difference between permitting a factfinder to consider a defendant's willingness to engage in criminal conduct which poses a substantial risk of death in deciding whether to infer that he acted with a purpose to take life, and defining such conduct as an ultimate fact equivalent to possessing a purpose to kill as Ohio has done. See *United States* v. *United States Gypsum Co., ante,* p. 422. Indeed, the type of conduct which Ohio would punish by death requires at most the degree of *mens rea* defined by the ALI Model Penal Code (1962) as recklessness: conduct undertaken with knowledge that death is likely to

follow.[9]  Since I would hold that death may not be inflicted for killings consistent with the Eighth Amendment without a finding that the defendant engaged in conduct with the conscious purpose of producing death, these sentences must be set aside.[10]

MR. JUSTICE REHNQUIST, concurring in part and dissenting in part.

I join Parts I and II of THE CHIEF JUSTICE's opinion for the Court, but am unable to join Part III of his opinion or in the judgment of reversal.

## I

Whether out of a sense of judicial responsibility or a less altruistic sense of futility, there are undoubtedly circumstances which require a Member of this Court "to bow to the authority" of an earlier case despite his "original and continuing belief that the decision was constitutionally wrong." *Burns* v. *Richardson*, 384 U. S. 73, 98 (1966) (Harlan, J., concurring in result). See also *id.*, at 99 (STEWART, J., concurring in judgment). The Court has most assuredly not adopted the dissenting views which I expressed in the previous capital

---

[9] Section 2.02 (2) (c) provides:

"A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."

In contrast, § 2.02 (2) (a) provides:

"A person acts purposely with respect to a material element of an offense when:

"(i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result . . . ."

[10] I find it unnecessary to address other constitutional challenges to the death sentences imposed in these cases.

punishment cases, see *Woodson* v. *North Carolina,* 428 U. S. 280, 308 (1976), and *Furman* v. *Georgia,* 408 U. S. 238, 465 (1972). It has just as surely not cloven to a principled doctrine either holding the infliction of the death penalty to be unconstitutional *per se* or clearly and understandably stating the terms under which the Eighth and Fourteenth Amendments permit the death penalty to be imposed. Instead, as I believe both the opinion of THE CHIEF JUSTICE and the opinion of my Brother WHITE seem to concede, the Court has gone from pillar to post, with the result that the sort of reasonable predictability upon which legislatures, trial courts, and appellate courts must of necessity rely has been all but completely sacrificed.

THE CHIEF JUSTICE states: "We do not write on a 'clean slate,' " *ante,* at 597. But it can scarcely be maintained that today's decision is the logical application of a coherent doctrine first espoused by the opinions leading to the Court's judgment in *Furman,* and later elaborated in the *Woodson* series of cases decided two Terms ago. Indeed, it cannot even be responsibly maintained that it is a principled application of the plurality and lead opinions in the *Woodson* series of cases, without regard to *Furman.* The opinion strives manfully to appear as a logical exegesis of those opinions, but I believe that it fails in the effort. We are now told, in effect, that in order to impose a death sentence the judge or jury must receive in evidence whatever the defense attorney wishes them to hear. I do not think THE CHIEF JUSTICE's effort to trace this quite novel constitutional principle back to the plurality and lead opinions in the *Woodson* cases succeeds.

As the opinion admits, *ante,* at 606 n. 14, the statute upheld in *Gregg* v. *Georgia,* 428 U. S. 153 (1976), permitted the sentencing authority to consider only those mitigating circumstances " 'authorized by law.' " *Id.,* at 164 (opinion of STEWART, POWELL, and STEVENS, JJ.) (citation omitted). Today's opinion goes on to say: "Although the Florida statute

approved in *Proffitt* [v. *Florida,* 428 U. S. 242 (1976)] contained a list of mitigating factors, six Members of this Court assumed . . . that the range of mitigating factors listed in the statute was not exclusive." *Ante,* at 606, and n. 15, citing *Proffitt, supra,* at 250 n. 8, 260. The footnote referred to discussed whether the Florida court would uphold a death sentence that rested entirely on nonstatutory aggravating circumstances. The reference to the absence of limiting language with respect to the list of statutory mitigating factors was employed to emphasize the different statutory treatment of aggravating circumstances. Indeed, only one page later the joint opinion stated: "The sentencing authority in Florida, the trial judge, is directed to weigh eight aggravating factors against seven mitigating factors to determine whether the death penalty shall be imposed." 428 U. S., at 251. The other *Proffitt* opinion referred to in today's opinion, the dissenting opinion of MR. JUSTICE WHITE, *id.,* at 260, said of mitigating circumstances: "[A]lthough the statutory aggravating and mitigating circumstances are not susceptible of mechanical application, they are by no means so vague and overbroad as to leave the discretion of the sentencing authority unfettered."

The opinion's effort to find support for today's rule in our opinions in *Jurek* v. *Texas,* 428 U. S. 262 (1976), is equally strained. The lead opinion there read the opinion of the Texas Court of Criminal Appeals to interpret the statute "so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show," *id.,* at 272, and went on to quote several specified types of mitigating circumstances which were mentioned in the Texas court's opinion. I think it clear from this context that the term "mitigating circumstances" was *not* so broad as to encompass any evidence which the defense attorney saw fit to present to a judge or jury.

It seems to me indisputably clear from today's opinion that,

while we may not be writing on a clean slate, the Court is scarcely faithful to what has been written before. Rather, it makes a third distinct effort to address the same question, an effort which derives little support from any of the various opinions in *Furman* or from the prevailing opinions in the *Woodson* cases. As a practical matter, I doubt that today's opinion will make a great deal of difference in the manner in which trials in capital cases are conducted, since I would suspect that it has been the practice of most trial judges to permit a defendant to offer virtually any sort of evidence in his own defense as he wished. But as my Brother WHITE points out in his dissent, the theme of today's opinion, far from supporting those views expressed in *Furman* which did appear to be carried over to the *Woodson* cases, tends to undercut those views. If a defendant as a matter of constitutional law is to be permitted to offer as evidence in the sentencing hearing any fact, however bizarre, which he wishes, even though the most sympathetically disposed trial judge could conceive of no basis upon which the jury might take it into account in imposing a sentence, the new constitutional doctrine will not eliminate arbitrariness or freakishness in the imposition of sentences, but will codify and institutionalize it. By encouraging defendants in capital cases, and presumably sentencing judges and juries, to take into consideration anything under the sun as a "mitigating circumstance," it will not guide sentencing discretion but will totally unleash it. It thus appears that the evil described by the *Woodson* plurality—that mandatory capital sentencing "papered over the problem of unguided and unchecked jury discretion," 428 U. S., at 302—was in truth not the unchecked discretion, but a system which "papered over" its exercise rather than spreading it on the record.

I did not, either at the time of the *Furman* decision or the decision in the *Woodson* cases, agree with the views expressed in *Furman* which I thought the lead opinions in the *Woodson*

cases sought to carry over into those opinions. I do, however, agree with the statements as to institutional responsibility contained in the separate opinions in *Burns* v. *Richardson*, 384 U. S. 73 (1966), and I trust that I am not insensitive to THE CHIEF JUSTICE's expressed concern in his opinion that "[t]he States now deserve the clearest guidance that the Court can provide" on capital punishment. *Ante*, at 602. Given the posture of my colleagues in this case, however, there does not seem to me to be any way in which I can assist in the discharge of that obligation. I am frank to say that I am uncertain whether today's opinion represents the seminal case in the exposition by this Court of the Eighth and Fourteenth Amendments as they apply to capital punishment, or whether instead it represents the third false start in this direction within the past six years.

A majority of the Court has yet to endorse the course taken by today's plurality in using the Eighth Amendment as a device for importing into the trial of capital cases extremely stringent procedural restraints. The last opinion on that subject to command a majority of this Court was that of Mr. Justice Harlan in *McGautha* v. *California*, 402 U. S. 183 (1971), in which he spoke for the Court in these words:

> "It may well be, as the American Law Institute and the National Commission on Reform of Federal Criminal Laws have concluded, that bifurcated trials and criteria for jury sentencing discretion are superior means of dealing with capital cases if the death penalty is to be retained at all. But the Federal Constitution, which marks the limits of our authority in these cases, does not guarantee trial procedures that are the best of all worlds, or that accord with the most enlightened ideas of students of the infant science of criminology, or even those that measure up to the individual predilections of members of this Court. See *Spencer* v. *Texas*, 385 U. S. 554 (1967). The Constitution requires no more than that trials be

fairly conducted and that guaranteed rights of defendants be scrupulously respected." *Id.*, at 221.

I continue to view *McGautha* as a correct exposition of the limits of our authority to revise state criminal procedures in capital cases under the Eighth and Fourteenth Amendments. Sandra Lockett was fairly tried, and was found guilty of aggravated murder. I do not think Ohio was required to receive any sort of mitigating evidence which an accused or his lawyer wishes to offer, and therefore I disagree with Part III of the plurality's opinion.

## II

Because I reject the primary contentions offered by petitioner, I must also address her other arguments, with which the Court does not wish to deal, in order to conclude that the State may impose the death penalty. Two of petitioner's objections can be dismissed with little comment. First, she complains that the Ohio procedure does not permit jury participation in the sentencing process. As the lead opinion pointed out in *Proffitt*, 428 U. S., at 252, this Court "has never suggested that jury sentencing is constitutionally required." No majority of this Court has ever reached a contrary conclusion, and I would not do so today. Second, she contends that the State should be required to prove the absence of mitigating factors beyond a reasonable doubt. Because I continue to believe that the Constitution is not offended by the State's refusal to consider mitigating factors at all, there can be no infirmity in shifting the burden of persuasion to the defendant when it chooses to consider them.

Petitioner also presents two arguments based on *United States* v. *Jackson,* 390 U. S. 570 (1968), in which the Court held that the imposition of the death penalty under the Federal Kidnaping Act, 18 U. S. C. § 1201 (a) (1964 ed.), was unconstitutional because it could only be imposed where the defendant exercised his right to trial by jury. First, petitioner

attacks the provision of the statute requiring three judges, rather than one, to hear the case when a defendant chooses to be tried by the court rather than the jury. She contends that the three judges are less likely to impose the death penalty than would be the single judge who determines sentence in the case of a jury trial. To that extent, she argues, the exercise of the right to a jury trial is discouraged because of a fear of a higher probability of the imposition of the death penalty. This argument cannot be supported. There is simply no reason to conclude that three judges are less likely than one to impose the death sentence on a convicted murderer. At the same time, it is at least equally plausible that the three judges would be less likely than a jury to convict in the first instance. Thus, at the time when an accused defendant must choose between a trial before the jury and a trial to the court, it simply cannot be said which is more likely to result in the imposition of death. Since both procedures are sufficiently fair to satisfy the Constitution, I see no infirmity in requiring petitioner to choose which she prefers.

Second, petitioner complains that the trial court has the authority to dismiss the specifications of aggravating circumstances, thus precluding the imposition of the death penalty, only when a defendant pleads guilty or no contest. She contends that this limitation upon the availability of judicial mercy unfairly penalizes her right to plead not guilty. While *Jackson* may offer some support for this contention, it certainly does not compel its acceptance. In *Jackson,* the defendant could have been executed if he exercised his right to a jury trial, but could not have been executed if he waived it. In Ohio, a defendant is subject to possible execution whether or not he pleads guilty. Furthermore, if he chooses to plead guilty, he is not subject to possible acquittal. Under such circumstances, it is difficult to imagine that any defendant will be deterred from exercising his right to go to trial. Indeed, petitioner was not so deterred, and respondent reports that

no one in petitioner's county has ever pleaded guilty to capital murder. Brief for Respondent 36. The mere fact that petitioner was required to choose hardly amounts to a constitutional violation. In *McGautha, supra,* at 212–213, the Court explained an earlier decision, *Simmons* v. *United States,* 390 U. S. 377 (1968), in which it had invalidated a conviction because the defendant had been required to forgo his Fifth Amendment privilege against self-incrimination to protect a Fourth Amendment claim. Here, petitioner's assertion of her right to go to trial would have deprived her only of a statutory possibility of mercy, not of constitutional dimensions, enjoyed by other defendants in Ohio. Nothing in *Jackson* suggests that such a choice is forbidden by the Fourteenth Amendment.

I finally reject the proposition urged by my Brother WHITE in his separate opinion, which the plurality finds it unnecessary to reach. That claim is that the death penalty, as applied to one who participated in this murder as Lockett did, is "disproportionate" and therefore violative of the Eighth and Fourteenth Amendments. I know of no principle embodied in those Amendments, other than perhaps one's personal notion of what is a fitting punishment for a crime, which would allow this Court to hold the death penalty imposed upon her unconstitutional because under the judge's charge to the jury the latter were not required to find that she intended to cause the death of her victim. As my Brother WHITE concedes, approximately half of the States "have not legislatively foreclosed the possibility of imposing the death penalty upon those who do not intend to cause death." *Ante,* at 625. Centuries of common-law doctrine establishing the felony-murder doctrine, dealing with the relationship between aiders and abettors and principals, would have to be rejected to adopt this view. Just as surely as many thoughtful moralists and penologists would reject the Biblical notion of "an eye for an eye, a tooth for a tooth," as a guide for minimum sentencing, there is nothing in the prohibition against

cruel and unusual punishments contained in the Eighth Amendment which sets that injunction as a limitation on the maximum sentence which society may impose.

Since all of petitioner's claims appear to me to be without merit, I would affirm the judgment of the Supreme Court of Ohio.