Michael Van McDOUGALL, Petitioner,

v.

Nathan A. RICE, Warden, Central Prison, Raleigh, North Carolina, Respondent.

No. C–C–87–114–P.

United States District Court, W.D. North Carolina. Charlotte Division.

April 27, 1988.

James C. Fuller, Thorp, Fuller & Slifkin, Raleigh, N.C., Richard A. Rosen, University of North Carolina, School of Law, Chapel Hill, N.C., for petitioner.

Barry S. McNeill, Asst. Atty. Gen., N.C. Dept. of Justice, Raleigh, N.C., for respondent.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, Chief Judge.

On March 9, 1987, Michael Van McDougall (Petitioner), a North Carolina prisoner, filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 attacking the constitutionality of his 1980 convictions for felonious assault, kidnapping, and first degree murder, and of the sentence of death that was imposed for the murder conviction. Specifically, McDougall alleged:

1. That he was denied the effective assistance of counsel at trial and at sentencing because:

a. Lead counsel, in the six months prior to trial, had been the subject of two state bar suspension orders;

b. Lead counsel, during trial, suffered physical problems which required emergency room treatment and for which he ingested "mind-altering drugs";

c. Lead counsel, at sentencing, delivered an "incoherent and offensive" summary argument;

d. Lead counsel, during the course of his representation of Petitioner, engaged in illegal and unethical conduct;

2. That the trial court's instructions to the jury at sentencing unconstitutionally interfered with the jury's consideration of mitigating circumstances and resulted in a "mandatory" death sentence because the instructions:

a. Failed to inform the jury that mitigating circumstances must be considered in deciding whether the aggravating factors were sufficiently substantial to call for the imposition of the death penalty; and

b. Advised the jury that it had a "duty" to impose the death penalty if it answered affirmatively certain questions asked on the written jury form;

3. That the trial judge violated Petitioner's rights when he:

a. Refused Petitioner's request that the non-statutory mitigating circumstances be submitted to the jury in writing; and

b. Failed to require the jury to indicate its finding on each non-statutory mitigating circumstance;

4. That the prosecution's presentation at sentencing of the underlying facts of Petitioner's prior rape conviction, violated Petitioner's due process and Eighth Amendment rights to a fair sentencing hearing; and

5. That North Carolina's death penalty law is unconstitutional because it is administered in an arbitrary, capricious and discriminatory manner.

The Attorney General, as Respondent, was directed to respond to Petitioner's application and complied by filing an Answer to Petition and Motion to Dismiss. Respondent also furnished the Court with copies of state court records relating to Petitioner's trial, conviction, sentencing hearing, appeals, and Motion for Appropriate Relief hearing, as well as copies of State Bar records. The Attorney General concedes in his Answer to Petition and Motion to Dismiss that Petitioner's claims have been exhausted in state court, and this assertion is corroborated by the state court records. *See State v. McDougall,* 308 N.C. 1, 301 S.E.2d 308, *cert. denied,* 464 U.S. 865, 104 S.Ct. 197, 78 L.Ed.2d 173 (1983), and *State v. Van McDougall,* —— N.C. ——, 344 S.E. 2d 3, *petition denied,* —— U.S. ——, 107 S.Ct. 238, 93 L.Ed.2d 163 (1986). Accordingly, the exhaustion requirement of 28 U.S.C. § 2254(b) has been met, and Petitioner's claims are ripe for review by this court.[1]

There is no need to conduct an evidentiary hearing on the claims raised in this petition. All but two of the claims present purely legal issues and, thus, do not require an evidentiary hearing. *Bradley v. Cowan,* 500 F.2d 380, 381 (6th Cir.1974). The remaining claims, whether Petitioner was denied effective assistance of counsel and whether North Carolina's death penalty statute is unconstitutional involve analyses of both facts and law. In connection with Petitioner's application for postconviction relief, Superior Court Judge Frank Snepp conducted a hearing on these claims at which both Petitioner and Respondent were afforded an opportunity to present evidence. Thereafter, Judge Snepp made extensive findings of facts and conclusions of law covering approximately twenty pages. *See* Judge Snepp's Memorandum Opinion and Order filed August 9, 1985. The factual findings of the state court, following a full and fair hearing on the

---

1. The exhaustion requirement ensures that state courts will have the initial opportunity to review constitutional challenges to state convictions and preserves the role of state courts in protecting federally guaranteed rights. *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).

merits, must be presumed to be correct. 28 U.S.C. § 2254; *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).[2]

## FACTUAL BACKGROUND

On August 21, 1979, Petitioner was arrested and charged with murder and assault with a deadly weapon. Petitioner was subsequently indicted on charges of (1) kidnapping; (2) burglary; (3) assault with a deadly weapon with intent to kill inflicting serious injury; and (4) first degree murder. After a three-week trial beginning on June 9, 1980, the jury returned verdicts of guilty on the charges of first degree murder, kidnapping, and assault with a deadly weapon with intent to kill inflicting serious injury. Petitioner's plea of not guilty by reason of insanity was rejected by the jury's special verdict. Petitioner was sentenced to death for the first degree murder conviction after the jury recommended the death penalty at the conclusion of Petitioner's sentencing hearing.

The evidence at both the trial and sentencing phases of Petitioner's case is summarized in *State v. McDougall*, 308 N.C. 1, 4–8, 301 S.E.2d 308, 311–13, *cert. denied*, 464 U.S. 865, 104 S.Ct. 197, 78 L.Ed.2d 173 (1983). Briefly, the State's evidence established that, on July 21, 1979, at approximately 2:45 a.m., Petitioner rang the doorbell of his neighbors, Vicki Dunno and Diane Parker. After some conversation about Petitioner being hurt "real badly," the victims let Petitioner come into the house. After Vicki Dunno went to get a phone book, Petitioner picked up the butcher knife in the kitchen and grabbed Diane Parker. After several struggles with both women, both inside and outside the house, Petitioner began stabbing Vicki Dunno. When Diane Parker went to get help, Petitioner ran after and caught her. Vicki Dunno then went to get help. When the police officers arrived, they found Diane Parker's body sprawled in Petitioner's

front yard, a few houses down from where the victims lived. When the officers brought in search lights to aid in the investigation, Petitioner came out from behind some bushes saying, "I give up. Okay, I give up." A blood analysis later showed that the blood on Petitioner's clothing matched Diane Parker's blood type.

After Petitioner was indicted, he retained Wallace Osborne to represent him. Because he did very little criminal work, Osborne, with Petitioner's consent, associated Michael Scofield as co-counsel.[3] Scofield was experienced in the litigation of major criminal cases, having previously served as an Assistant United States Attorney in the Western District of North Carolina and as the Public Defender for Mecklenburg County. Scofield had also been involved in the defense of major criminal cases as a private practitioner. Both attorneys thoroughly investigated Petitioner's case and prepared for trial. They attempted to enter into plea negotiations with the State but were unsuccessful.

On February 27, 1980, Petitioner was sent to Dorothea Dix Hospital for psychiatric examinations and evaluation of his sanity. While there, Petitioner was treated for amnesia by Dr. Stephan S. Teich, a psychiatrist, and Courtney Mullin, a "juristic psychologist," both of whom were privately retained. Both Teich and Mullin had been associated with Jerome "Jerry" Paul in other criminal trials and urged Petitioner to retain Paul for his defense. After meeting with Scofield, Petitioner and Petitioner's family, Paul was retained by Petitioner in May of 1980.

Paul had suffered from severe migraine headaches since the death of his youngest son in 1977. In 1979, Paul moved from North Carolina to New York and placed himself under the psychiatric care of Dr. Teich. While in New York, Paul was hospitalized several times for migraine headaches. During this period, Paul had neglected his professional duties in the State

---

2. Petitioner has not alleged, nor have I independently perceived, any of the eight factors set forth in § 2254(d) which would undermine the reliability of the state court's findings of fact.

3. The defendant has stipulated that there is no direct evidence of inadequacy, incompetency or error on the part of Osborne or Scofield. Tr. of Evidentiary Hearing at 4.

of North Carolina and disciplinary procedures were instituted against him as the result of grievances filed with the North Carolina State Bar.

Petitioner was represented at trial by Paul, Scofield and Osborne, and he designated Paul to serve as lead counsel. The defense contended that Petitioner suffered from a cocaine-induced psychosis, as well as underlying depression and organic brain damage. In support of this contention, the defense put on evidence showing that Petitioner had suffered through severe and traumatic events during his childhood, that he had injected himself with cocaine on the night of the murder, and that he claimed to have amnesia concerning the events surrounding the murder and assault on August 21, 1979. Despite his alleged amnesia, Petitioner was able to give his psychiatrist enough information for the psychiatrist to testify that, in his expert opinion, Petitioner believed, at the time of the attacks, that he was fighting his mother, who was beating him. Petitioner did not testify at trial.

The jury, at the sentencing phase, found as aggravating circumstances that Petitioner had previously been convicted of a felony involving the use of violence to the person; that the murder was especially heinous, atrocious and cruel; and that the murder was part of a course of conduct which included the commission of another crime of violence against another person. As mitigating circumstances, the jury found, among other things, that the murder was committed while Petitioner was under the influence of a mental or emotional disturbance, and that Petitioner's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. At the conclusion of the sentencing hearing, the jury recommended the death penalty, which the trial court imposed.

## PETITIONER'S ALLEGATIONS

### I.

Petitioner contends that he was denied the effective assistance of counsel at trial and sentencing because:

(A) lead counsel, in the six months prior to trial, had been the subject of two State Bar suspension orders;

(B) lead counsel, during trial, suffered physical problems which required emergency room treatment and for which he ingested "mind-altering drugs";

(C) lead counsel, at sentencing, delivered an "incoherent and offensive" summary argument; and

(D) lead counsel, during the course of his representation of Petitioner, engaged in illegal and unethical behavior.

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court adopted a two-pronged test for assessing the performance of defense counsel:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes *both* showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. 668, 687, 104 S.Ct. at 2052, 2064, 80 L.Ed.2d 674 (1984) (emphasis supplied). *Accord, Roach v. Martin*, 757 F.2d 1463, 1476 (4th Cir.), *cert. denied*, 474 U.S. 865, 106 S.Ct. 185, 88 L.Ed.2d 154 (1985).

 Under the *Strickland* standard, counsel's performance cannot be evaluated retrospectively. Instead,

[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circum-

stances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689, 104 S.Ct. at 2065 (citation omitted). Moreover, "strategic choices made by an attorney after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable...." 466 U.S. at 690, 104 S.Ct. at 2066.

### A.

■ In his first claim, Petitioner alleges that he was denied effective assistance of counsel because Jerry Paul, in the six months prior to trial, had been the subject of two State Bar suspension orders. After reviewing the records of the North Carolina State Bar, Judge Snepp found that the orders suspending Paul from the practice of law, issued on January 28, 1980 and on May 23, 1980, were not effective until April 2, 1981, because Paul appealed the orders. *See* Memorandum Opinion and Order at 5–6. Accordingly, Paul retained his license to practice law in North Carolina throughout the period of his representation of Petitioner. Because Petitioner has failed to allege either deficient performance or prejudice stemming from the simple fact that Paul had suspension orders pending against him while he represented Petitioner, the instant claim will be dismissed.

### B.

Petitioner next alleges that lead counsel suffered physical problems during trial which required emergency room treatment and for which he ingested "mind-altering drugs." Specifically, Petitioner alleges that Paul became ill and had to leave the courtroom on several occasions and that Paul received emergency room treatment and prescription drugs for migraine headaches.

After careful consideration of the record, Judge Snepp found:

(1) that Paul had been treated at hospital emergency rooms on nine occasions during the lengthy proceedings;

(2) that medications, including narcotics, were administered to Paul under a doctor's supervision; and

(3) that, on two occasions, Paul was unable to conduct the examinations of witnesses.

Memorandum Opinion and Order at 6–8. Concerning the nine visits to area hospitals, Judge Snepp found that eight of the visits were at night; that one was in the morning before court hours; and that court was in recess on the days after three of these visits.

In regard to Paul's overall performance at trial, Judge Snepp found no evidence of any specific error resulting from Paul's mental or physical condition and concluded that:

Paul actively and vigorously participated in the vast majority of all aspects of the trial. He conducted lengthy voir dire examination of jurors; examined and cross-examined numerous witnesses; lodged proper objections; participated in planning sessions with co-counsel; conferred with Defendant; argued motions; made jury arguments; and otherwise discharged the duties of a defense counsel.

Memorandum of Opinion and Order at 7.

■ Evidence that counsel was treated at hospitals at various times during trial or that counsel used prescription drugs during this period is insufficient to state a claim of ineffective assistance of counsel. Instead, Petitioner must show specific incidents of deficient performance resulting from drug use and prejudice stemming from such performance. *Berry v. King,* 765 F.2d 451, 454 (5th Cir.1985), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2290, 90 L.Ed.2d 731 (1986). *Accord, Young v. Zant,* 727 F.2d 1489 (11th Cir.1984) (Petitioner's observation that counsel ingested drugs during trial and counsel's admission of his drug prob-

lem in another proceeding do not automatically support a claim of ineffectiveness), *cert. denied,* 470 U.S. 1009, 105 S.Ct. 1371, 84 L.Ed.2d 390 (1985); *Hernandez v. Wainwright,* 634 F.Supp. 241 (S.D.Fla. 1986) (Petitioner's claims that counsel was an alcoholic and had alcohol on his breath during trial were not enough to constitute a *per se* Sixth Amendment violation; instead, Petitioner had to show how the condition caused counsel to render deficient legal representation which resulted in prejudice), *aff'd,* 813 F.2d 409 (11th Cir.1987).

The only examples of deficient performance offered by Petitioner in support of his claim are the two times Paul was unable to conduct the examination of witnesses. Although Paul's performance was deficient in these instances, no prejudice resulted because Scofield took over and conducted the examinations very effectively.[4] *See* Transcript of Evidentiary Hearing at 16. Since Petitioner has failed to demonstrate that Paul's occasional medical problems prejudiced the defense, his claim of ineffective assistance of counsel based on those problems must fail.

### C.

Petitioner alleges that he received ineffective assistance of counsel because Paul delivered an "incoherent and offensive" summary argument at sentencing. Specifically, Petitioner claims that Paul, having assigned himself the final argument[5] before the sentencing jury, embarked on a "disjointed and personal history, portraying himself as a great civil rights leader." Petition at 10. Moreover, although all of the jurors had expressed belief in the death penalty, Paul argued that:

> ... the death penalty is the tool of the fascist ... why do you think that fascists want the death penalty? It's becuase (sic) they can kill the minorities ... Every human being who believes in capital punishment loves killing, and the only reason they believe in capital punishment is because they get a kick out of it ... we did a long study on Nazi Germany to discover why people turn to Fascism and turn to Nazism ... one of the dividing lines, the main one, was whether or not you're in favor of the death penalty....

*Id.* Trial/Sentencing Tr. at 4439–51.

Counsel were not impressed with Paul's argument. Scofield testified at the state postconviction hearing that he found Paul's sentencing argument to be "tactless, ill-advised, [and] stupid." Tr. of Evidentiary Hearing at 129. Osborne was more restrained in his remarks, testifying that he found the arguments to be "extremely foreign to his philosophy and beliefs." *Id.* at 212–13. Both Scofield and Osborne testified that, had Paul not come into the case or had they not used some of the tactics employed during the trial, they believed they could have obtained a different result. *Id.* at 140, 211.

Further criticism for Paul's argument came from Charlotte attorney Allen Bailey, a trial lawyer for 34 years and past president of the North Carolina Academy of Trial Lawyers. In an affidavit introduced at the probable cause hearing, Bailey said that he had reviewed the transcript of Paul's closing argument and that he believed the argument "failed to meet the standard of legal practice in Mecklenburg ... or any other county in the state ... [and was] so outrageous in and of itself that it [made] Paul's performance as Counsel, at least during the penalty phase, inadequate and incompetent." Petition at 11.

In his factual findings, Judge Snepp found that Paul intentionally framed his argument to influence the six black jurors

---

4. After reviewing the record, Judge Snepp found that Scofield was allowed a sufficient opportunity to confer with the witnesses before he proceeded and that he effectively conducted the examinations. Memorandum Opinion and Order at 7. Petitioner's stipulation that there is no evidence of direct incompetency or error against either Scofield or Osborne, gives support to Judge Snepp's conclusion of Scofield's effective examinations.

5. Osborne and Scofield delivered their arguments to the sentencing jury first. Paul delivered the argument about which Petitioner complains after the prosecutor made his argument to the jury.

on the panel; that he worked hard on the argument; and that he had discussed it with Dr. Teich, a psychiatrist on the defense team. Judge Snepp concluded:

> If, as he obviously planned and hoped, one juror had refused to join in a recommendation of death, the only possible satisfactory result would have been attained. That he did not succeed does not demonstrate that the argument constituted ineffectiveness, and the fact that the jury deliberated for seven hours before returning a verdict tends to belie the opinion of Scofield that Paul's argument was "stupid", and [the opinion of] Bailey that it was offensive to the jurors.

Memorandum Opinion and Order at 15. Based upon his findings, Judge Snepp went on to conclude as a matter of law that Paul's sentencing argument did not constitute ineffective assistance of counsel. *Id.* at 16.

█ Consistent with Judge Snepp's well-reasoned findings, the evidence shows that Paul chose the content of his argument with the goal of convincing at least one of the six black jurors on the panel to vote against the death penalty, and that Paul discussed the theory behind his closing argument with other members of the defense team. Tr. of Evidentiary Hearing at 164–5. Indeed, Scofield admitted at the postconviction hearing that Paul spent a great deal of time thinking about his closing argument and talking to Teich about it in Scofield's presence. *Id.* Because Paul deliberated at length before choosing the approach of his argument and because he sought advice from others, including a psychiatrist, about the possible impact of the approach he chose, the resulting choice was clearly a "strategic [one] made after thorough investigation of law and facts relevant to plausible options [and is] virtually unchallengeable." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. *Accord, Coleman v. Brown,* 802 F.2d 1227 (10th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987); *Hoots v. Allsbrook,* 785 F.2d 1214 (4th Cir.1986); *Young v. Sams,* 510 F.Supp. 141 (E.D.N.C.1980) (Even if defense counsel's decision results in unfavorable consequences for his client, so long as his performance reflects a reasonable weighing of competing interests, the decision may be properly denominated as a tactical choice within the range of effective assistance), *dism.,* 679 F.2d 892 (4th Cir. 1982). Although Petitioner now believes that Paul's argument antagonized the jury and diminished his chances of receiving a life sentence, that belief results from the type of retrospective second-guessing that plays no part in this Court's analysis of counsel's performance. *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *Jeffers v. Leeke,* 835 F.2d 522 (4th Cir.1987); *Hyman v. Aiken,* 824 F.2d 1405 (4th Cir.1987); *Roach v. Martin,* 757 F.2d 1463 (4th Cir.), *cert. denied,* 474 U.S. 865, 106 S.Ct. 185, 88 L.Ed.2d 154 (1985); *Hutchins v. Garrison,* 724 F.2d 1425 (4th Cir.1983), *cert. denied,* 464 U.S. 1065, 104 S.Ct. 750, 79 L.Ed.2d 207 (1984). Accordingly, the Court finds that Petitioner has failed to overcome the presumption that Paul's choice of argument could be considered sound trial strategy.

Given the serious nature of this case, the Court will also briefly analyze Paul's closing argument under the prejudice prong of the *Strickland* test. In order to establish a claim of ineffective assistance of counsel, Petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the sentencing hearing would have been different. Petitioner offered the testimony of co-counsel at the postconviction hearing in an effort to make this showing. Scofield testified that he "would certainly like to think that if Jerry Paul had not come into the case [the result] would or might have been different...." Transcript of Evidentiary Hearing at 140. Osborne stated that, in his opinion, they "could have had a different result if [they] had not done some things during the guilt or innocence phase." *Id.* at 211. In his affidavit, Allen Bailey concluded that Paul's performance was inadequate, but failed to suggest that the result would have been different if Paul had argued differently or not at all.

Petitioner's evidence was rebutted by the affidavit of the trial judge, the Honorable Forrest Ferrell. Judge Ferrell stated that,

as a judge who had presided over numerous criminal cases, including nine capital cases, he found the argument "to be as good as, if not better, than the majority of death penalty arguments I have heard." Affidavit at 3. After reading the sentencing arguments in their entireties, this Court is far more persuaded by the opinion of Judge Ferrell than by the self-serving testimony of co-counsel.

▪ All three defense counsel argued to the jury during Petitioner's sentencing hearing. Each argument had a different focus.[6] Osborne spoke briefly about the irrevocability of a death penalty verdict, mitigating factors, and Petitioner's impaired ability to conform to the law. Scofield argued at length, concentrating on specific mitigating factors which had been raised in the sentencing hearing and quoting biblical passages illustrating his conclusion that the death penalty was not the proper solution in Petitioner's case. Paul's argument focused on the death penalty itself and the inhumanity and consequences of such a penalty. The three arguments together represented a comprehensive effort to present the totality of the circumstances in the light most favorable to Petitioner and to persuade the jury that imposition of death penalty would be inappropriate. As Judge Ferrell stated in his affidavit,

> Mr. Osborne and Mr. Scofield by their arguments had already argued why they felt the death penalty was wrong specifically in this case. These three defense arguments meshed, in my opinion, to present to the jury the significant points against imposing the death penalty on Michael McDougall.

Affidavit at 3. Had the jury found the mitigating factors argued by Scofield sufficient to warrant a life sentence, it would have recommended that sentence, regardless of any shortcomings in Paul's argument. In light of the overall strength, organization and persuasiveness of the sentencing arguments presented on Petitioner's behalf, there simply is not any reasonable probability that, but for Paul's closing argument, Petitioner would have received a life sentence. Accordingly, Petitioner's allegation that he was denied effective assistance of counsel because Paul delivered an "offensive and incoherent" sentencing argument must fail.

### D.

Petitioner contends that he was denied effective assistance of counsel because Paul engaged in illegal and unethical behavior during the course of his representation of Petitioner. Specifically, Petitioner alleges that Paul (1) "puff[ed] his wares and denigrated co-counsel's pretrial efforts to Petitioner and his family in order to solicit this case; (2) importuned Petitioner, his mother and his wife to give perjured testimony to support Petitioner's insanity defense; (3) gave a local television station video tapes of Petitioner speaking to Teich while under hypnosis; (4) gave Petitioner illegal drugs over the course of the trial; (5) used illegal drugs himself during the course of the trial; and (6) caused turmoil among the members of the defense team."

▪ In *Nix v. Whiteside*, 475 U.S. 157, 165, 106 S.Ct. 988, 994, 89 L.Ed.2d 123 (1986), the Supreme Court held that a "breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel" under the *Strickland* standard. Although the Court recognized the existence of standards of professional conduct as formulated by the states, it declined to define what weight is to be given to such standards when considering the issue of effective assistance of counsel. *Id.* Consequently, there is no *per se* rule embracing Petitioner's theory that counsel's illegal and unethical behavior alone constituted ineffective assistance of counsel; instead, counsel's behavior is a factor to be considered in determining whether his performance fell below the range of reasonable, professional assistance. In the event that the Court should find counsel's performance deficient, Petitioner must still

---

**6.** Osborne testified that all three counsel discussed the subject of closing arguments and agreed that each would cover a different area. Tr. of Evidentiary Hearing at 217.

show that such performance prejudiced the outcome of his trial.

■ Petitioner initially alleges that Paul violated the Disciplinary Rules of the North Carolina Code of Professional Responsibility by "puffing his wares" and by denigrating Scofield's and Osborne's pretrial efforts to Petitioner and his family in order to solicit the representation of Petitioner. Petitioner does not cite any specific act or omission resulting from Paul's "puffing" which might have prejudiced his defense. In fact, Petitioner has only alleged two acts or omissions in Paul's overall performance at trial which he claims prejudiced the outcome of the proceedings: Paul's failure to conduct the examinations of expert witnesses on two occasions and his closing argument to the sentencing jury. The Court has already considered these alleged deficiencies and concluded that they did not adversely affect the result of the proceedings. Accordingly, his claim of ineffective assistance based on Paul's "puffing" is without merit.

■ Petitioner also alleges that Paul repeatedly importuned Petitioner, his mother, and his wife to give perjured testimony during trial to support his and Teich's insanity defense. While such behavior is both unethical and illegal, Petitioner has shown no specific act or omission which might have prejudiced his defense as a result of Paul's alleged solicitation of false testimony. Inasmuch as Petitioner, his mother, and his wife did not testify in the way Paul allegedly suggested, there was no prejudice to the outcome of the proceedings and the instant allegation must fail.

■ Petitioner next alleges that Paul gave a local television station videotapes of Petitioner speaking to Teich while under hypnosis. The defense had previously attempted to introduce the videotapes into evidence but had been unsuccessful and Petitioner claims that Paul gave the videotapes to the media against Judge Ferrell's specific order, saying that "if he (Paul) couldn't win the case in the courtroom, he would win it in the news media." Petition at 10.

Portions of the video tapes were shown on a local news program while the jury was in overnight recess during the course of its deliberations on Petitioner's guilt or innocence. Before the jury resumed deliberations the next morning, the prosecutor advised Judge Ferrell that the tapes had been shown on the news. Judge Ferrell summoned the jury and explained that certain tapes of Petitioner had been aired. He then asked if any of the jurors had seen the broadcasts, or had heard about them or discussed them with anyone else. All of the jurors indicated that they had neither seen the tapes nor heard about them. Judge Ferrell then carefully instructed the jurors, as he had done before, not to watch or listen to any broadcast concerning the trial, not to read any accounts of the trial, and not to discuss the case with anyone.

Although Paul violated disciplinary rules by turning the videotapes over to the television station and by his statements to the media, the broadcast of the tapes had no effect on the jury's deliberations because the jurors were not in any way exposed to the contents of the tapes. In the absence of any prejudice, counsel's inappropriate conduct does not merit granting Petitioner relief.

■ At the postconviction evidentiary hearing, Petitioner testified that Paul gave him illegal drugs during the trial while he was an inmate of the Mecklenburg County Jail. Petitioner fails to allege specific errors in Paul's performance or in his own conduct which resulted from these illegal acts and which might have prejudiced the outcome of his trial.

Petitioner also alleges that Paul used illegal drugs during trial and, thus, was not competent to perform his duties as counsel. The only deficiencies in Paul's performance which Petitioner cites are the failure to examine two witnesses and his "offensive and incoherent" summary argument. The Court has already determined that neither of these alleged deficiencies resulted in prejudice to the defense.

In regard to Paul's overall performance, Wallace Osborne testified at the postconviction hearing that he had no indication

that Paul was under the influence of any intoxicant during trial. Additionally, Scofield admitted that he never had any reason to believe that Paul was under the influence of any drugs at any time during the seven weeks of trial. At the conclusion of all the evidence presented in the evidentiary hearing, Judge Snepp found no specific error resulting from Paul's mental or physical condition. He also found that Paul "discharged the duties of a defense counsel" by actively and vigorously participating in the vast majority of all aspects of the trial. Memorandum Opinion and Order at 7. After thorough review of the record, the Court concurs in Judge Snepp's assessment of Paul's performance and concludes that Petitioner's claim based on Paul's alleged use of illegal drugs is without merit under the *Strickland* standard.

■ Petitioner's next allegation is that Paul caused turmoil among the defense team. He claims that Paul's behavior caused "shouting matches between counsel" over strategies and that counsel were fighting with each other all the time. Petition at 8. Both Scofield and Osborne testified at the postconviction evidentiary hearing that there were serious disagreements between Paul and themselves; however, they also testified that they had had disagreements, and even heated arguments, with other co-counsel in other trials. Additionally, Scofield testified that he did not think "there were any communication problems that rendered [their] efforts meaningless," Tr. of Evidentiary Hearing at 165, and that the biggest problem for the defense resulted from Petitioner's inability to remember anything about the night of the murder until after the trial began. *Id.* at 144.

Judge Snepp found that the defense attorneys were able to communicate satisfactorily with each other and with Petitioner and his family, despite the disagreements among them. This finding is amply supported by the evidence before Judge Snepp and this Court. Inasmuch as Petitioner has failed to show any adverse effect on the outcome of the proceedings or to identify specific deficiencies in Paul's represen-

tation as the result of the alleged turmoil among defense counsel, this claim of ineffective assistance of counsel is without merit.

■ Petitioner also contends that Paul rendered ineffective assistance because his behavior and actions caused chaos in the defense and resulted in a total lack of witness preparation.

Courtney Mullin testified at the postconviction hearing that her expert testimony at trial was disjointed because of the prosecution's many hearsay objections and because she had not been prepared by defense counsel to deal with this problem. *Id.* at 46. Although Ms. Mullin may have been dissatisfied with her testimony, evidence that she was an important member of the defense team and participated in several of the defense planning sessions seriously undercuts her claim of lack of preparation. Moreover, a review of the trial transcript reveals that Ms. Mullin was able to tell the jury in detail about her treatment of Petitioner and his statements to her despite objections by the prosecutor.

Dr. Brad Fisher, another expert witness, also testified that no one had prepared him prior to his testimony. Dr. Fisher had administered several psychological tests to Petitioner in November and December of 1979, and had sent a written report of his findings to counsel ten days before he was called to testify in the guilt phase. Although Dr. Fisher did not consult with any of the defense attorneys about the theory of defense prior to giving his testimony, he did talk to Dr. Teich, a member of the defense team who had conferred with both defense counsel and Petitioner. Examination of the transcript of Dr. Fisher's trial testimony gives no indication of a lack of preparation but shows, instead, that Dr. Fisher testified at length about the tests he had administered to Petitioner and his conclusions based upon those test results. Petitioner's failure to demonstrate prejudice arising from the alleged lack of witness preparation precludes the granting of relief.

■ Petitioner has also claimed that Paul's monetary needs and his interest in

enhancing his professional reputation constituted conflicts of interest which impaired his ability to make decisions in Petitioner's case. In order to prevail on a conflict of interest claim, Petitioner must demonstrate that "an *actual* conflict of interest adversely affected his lawyer's performance," *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980) (emphasis supplied); and the mere "possibility of conflict is insufficient to impugn a criminal conviction." *Id.* 446 U.S. at 350, 100 S.Ct. at 1719. Such a showing will be very difficult in this instance for, as Judge Snepp noted, "if ... considerations [of reputation and income] constitute conflicts of interest, perhaps a majority of lawyers could never ethically represent any client." Memorandum Opinion and Order at 10.

Scofield testified at the postconviction hearing that he told Petitioner and his family it would be a victory if Petitioner received a life sentence and that Petitioner and his family said they would not be satisfied with such a victory or with anything more than a few years in a mental institution. *Id.* at 152–3. Petitioner and his family subsequently retained Paul to head the defense because they wanted a "fighter" in the guilt stage in order to obtain an acquittal, rather than pursuing Scofield's and Osborne's strategy of putting on a "polite defense" and focusing on the penalty stage in order to save Petitioner's life. Transcript of Evidentiary Hearing at 152. Their decision to hire Paul was influenced by his past experience in defending capital cases and by his recent involvement in another case in which Dr. Teich's testimony was used to obtain a verdict of not guilty by reason of insanity. *Id.* at 154–155.

It appears from this evidence that many of the more fundamental decisions about defense strategies were made before Paul was even brought into the case. Moreover, if Paul's primary interest in representing Petitioner was to enhance his own reputation, there was no conflict because that interest would have been best served by obtaining Petitioner's acquittal. Accordingly, the Court finds no basis for Petitioner's contention that Paul's desire for fame and fortune created a conflict of interest between him and his client. Neither does the Court find any specific instances of prejudice stemming from this alleged conflict.

Paul was also innocent of entering into an unethical fee arrangement which was contingent upon a particular outcome. Like Scofield and Osborne, Paul was to receive a certain sum prior to undertaking Petitioner's defense and was to bill Petitioner's family for subsequent expenses. Although Paul may have needed the money he received for defending Petitioner, there is no indication that this need created a divergence between the interests of Paul and Petitioner with regard to any factual or legal issue in Petitioner's defense. In the absence of any evidence demonstrating the existence of an actual conflict of interest, Petitioner's claim of ineffective assistance of counsel must fail.

 Although the Court has considered each of Petitioner's claims against Paul on the merits, such consideration was not essential to the resolution of his allegation of ineffective assistance of counsel. Petitioner was represented by three *retained* attorneys from three *different* law firms. Although Paul was lead counsel, Scofield and Osborne were actively involved in Petitioner's defense—each participated in investigating and planning the defense; arguing motions; selecting the jury; examining witnesses; and making closing arguments to the jury. The involvement of these two attorneys and Petitioner's acknowledgement of their competent representation precludes the granting of relief based on the allegedly inadequate performance of the third member of the defense team. *See, e.g., Durham v. Blankenship,* 461 F.Supp. 492 (W.D.Va.1978), *dism. without opinion,* 609 F.2d 506 (4th Cir.1979).

## II.

Petitioner contends that the trial court's instructions to the jury at sentencing unconstitutionally interfered with the jury's consideration of mitigating circumstances and resulted in a "mandatory" death penal-

ty. According to Petitioner, this result was brought about because the trial judge

(a) failed to inform the jury that mitigating circumstances must be considered in deciding whether the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty; and

(b) advised the jury that it had a "duty" to impose the death penalty if it answered affirmatively certain questions asked on the written jury form.

The instant allegation requires reference to the fourth issue and a portion of the instructions submitted to the jury. The issue reads as follows:

4. Do you find beyond a reasonable doubt that the aggravating circumstance or circumstances you have found is or are sufficiently substantial to cause the imposition of the death penalty?

The pertinent portion of the instructions reads as follows:

So then, Members of the Jury, finally, I instruct you for you to recommend that the defendant be sentenced to death, the State must prove three things beyond a reasonable doubt from the evidence:

FIRST, that one or more statutory aggravating circumstances existed; and,

SECOND, that the mitigating circumstances found by you are insufficient to outweigh the aggravating circumstances, if any, found by you; and,

THIRD, that the aggravating circumstances, if any, found by you are sufficiently substantial to call for the imposition of the death penalty.

. . . . .

. . . If the State has proven these three things to you beyond a reasonable doubt, and you unanimously so find, it would be your *duty* to recommend that the defendant be sentenced to death. If you do not so find, or if you have a reasonable doubt to one or more of these things, it would be your *duty* to recommend that the defendant be sentenced to life imprisonment.

(*Id.* at 4474–5) (emphasis supplied).

It is Petitioner's contention that the form of the fourth issue allowed the jury to impose the death penalty without consideration of mitigating circumstances. He also contends that the "duty" language used by Judge Ferrell in the last part of his instructions was tantamount to a mandatory death penalty. In addressing these contentions on direct appeal, the North Carolina Supreme Court found that the instructions and issue 4 were poorly drafted but that neither the instructions nor the issue violated the State's death penalty statute or created prejudicial or constitutional error when considered in context. *See State v. McDougall,* 308 N.C. at 27–33, 301 S.E.2d 308.

■ A mandatory death sentence is unconstitutional, *see Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed. 2d 944 (1976), as is a capital sentencing system which allows the jury to consider only aggravating circumstances. *See Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). In order to determine whether the instructions at issue here interfered with the jury's consideration of mitigating circumstances, the court must decide what "a reasonable juror could have understood [those instructions] as meaning." *California v. Brown,* 479 U.S. 538, ——, 107 S.Ct. 837, 838–40, 93 L.Ed.2d 934 (1987) (quoting *Francis v. Franklin,* 471 U.S. 307, 315–6, 105 S.Ct. 1965, 1972, 85 L.Ed.2d 344 (1985)). If the specific language challenged by Petitioner fails constitutional muster, then the Court must "review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *Id.*

■ To paraphrase the North Carolina Supreme Court, the issue challenged by Petitioner does not provide a model for use in future death penalty cases. Nonetheless, when considered in the context of Judge Ferrell's charge, the issue did not invite or create an arbitrary or unconstitutional result.

Contrary to Petitioner's claim, Judge Ferrell placed a good deal of emphasis in his instructions on mitigating factors, *see* Trial/Sentencing Tr. at 4466–71 and he specifically advised the jurors that they must

weigh the mitigating circumstances against the aggravating circumstances before they could reach issue 4. *See Id.* at 4472. Moreover, in the portion of the instructions about which Petitioner is complaining, Judge Ferrell explicitly stated that, in order for the jurors "to recommend that the defendant be sentenced to death, the State must prove ... beyond a reasonable doubt ... that the mitigating circumstances found by [them were] insufficient to outweigh the aggravating circumstances, if any ...." *Id.* at 4474. Clearly, the jury had ample opportunity and reason to consider mitigating circumstances in making its sentencing decision.

■ Judge Ferrell's instructions to the jurors regarding their "duty" to return the death penalty, was consistent with existing North Carolina case law and conformed to the applicable North Carolina Criminal Pattern Jury Instructions. *See State v. Pinch,* 306 N.C. 1, 292 S.E.2d 203, *cert. denied,* 459 U.S. 1056, 103 S.Ct. 474, 74 L.Ed.2d 622 (1982); *State v. Williams,* 305 N.C. 656, 292 S.E.2d 243, *cert. denied,* 459 U.S. 1056, 103 S.Ct. 474, 74 L.Ed.2d 622 (1982); *State v. Smith,* 305 N.C. 691, 292 S.E.2d 264, *cert. denied,* 459 U.S. 1056, 103 S.Ct. 474, 74 L.Ed.2d 622 (1982). In *State v. Pinch,* the North Carolina Supreme Court explained why the "duty" instruction is appropriate.

> [The jury] ha[s] no ... option to exercise unbridled discretion and return a sentencing verdict wholly inconsistent with the findings it [makes] pursuant to G.S. 15A–2000(c). The jury may not arbitrarily or capriciously *impose* or *reject* a sentence of death. Instead, the jury may only exercise guided discretion *in making the underlying findings* required for a recommendation of the death penalty within the "carefully defined set of statutory criteria that allow them to take into account the nature of the crime and the character of the accused."

306 N.C. at 33, 292 S.E.2d 203 (citations omitted) (emphasis in original).

The North Carolina Supreme Court's holding in *Pinch* is consistent with the basic standard for constitutionally permissible sentencing proceedings in death penalty cases. That standard was succinctly stated by the Fourth Circuit in *Rook v. Rice,* 783 F.2d 401, 406 (4th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986).

> The procedure involved in imposing the death penalty need not be structured to favor a defendant but need only avoid creating a fundamentally unfair trial. *See Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983). The best of all procedural worlds is not guaranteed by the United States Constitution. *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971). In *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the Supreme Court emphasized that in designing a constitutional capital punishment system, all that the state is required to provide is a meaningful basis for distinguishing between those trials resulting in a penalty of death and those in which a penalty of life imprisonment is imposed. Under *Zant,* this is accomplished by simply identifying aggravating circumstances and requiring that one or more of them be found. "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant,* 103 S.Ct. at 2743–44.

After careful scrutiny of Judge Ferrell's entire charge, the Court finds that it permitted and even encouraged individualized consideration of Petitioner's background and the details of the crime and that it did not interfere with or usurp any of the jury's duties. Moreover, Judge Ferrell's instructions to the jury regarding its "duties" were entirely proper for " 'where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed or limited so as to minimize the risk of wholly arbitrary and capricious action.' " *Zant v. Stephens,* 462 U.S. at 874, 103 S.Ct. at 2741 (citation omitted).

Based upon the foregoing discussion, the instant claim will be dismissed.

### III.

Petitioner next alleges that Judge Ferrell violated his constitutional right to have the jury consider all mitigating circumstances by

(A) refusing Petitioner's request that the non-statutory mitigating circumstances be submitted to the jury in writing;

(B) failing to require the jury to indicate its findings on each non-statutory mitigating circumstance; and

(C) charging the jury that "the law of North Carolina specifies the mitigating circumstances which might be considered by you, and only those circumstances created by statute, about which I shall instruct you, may be considered by you." Reply Brief at 33.

Petitioner argues that a reasonable juror could have concluded from Judge Ferrell's treatment of the non-statutory mitigating factors that such factors were not as important and not entitled to as much weight as the statutory ones.

It is unconstitutional for a jury to be instructed not to consider evidence of non-statutory mitigating circumstances. *Hitchcock v. Dugger,* — U.S. ——, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). Indeed, it is unconstitutional to preclude the jury in a capital case from considering "as a mitigating factor any aspect of defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" because the omission of such evidence creates an unconstitutional risk that the death penalty will be imposed in spite of factors which may call for a lesser sentence. *Lockett v. Ohio,* 438 U.S. 586, 604 and 605, 98 S.Ct. 2954, 2964 and 2965, 57 L.Ed.2d 973 (1978). *Accord, Eddings v. Oklahoma,* 455 U.S. 104, 113–4, 102 S.Ct. 869, 876, 71 L.Ed.2d 1 (1982) (Sentencer may not refuse to consider, as a matter of law, any relevant mitigating evidence.)

In the instant case, neither the North Carolina capital sentencing statute nor the trial judge precluded the jury from considering all of the evidence presented in mitigation. At the beginning of the charge, Judge Ferrell instructed the jury that all of the evidence presented during both phases of the trial was available for their consideration and that they should "recall, consider, and weigh all of [that] evidence." Trial/Sentencing Tr. at 4470–71. Although, at one point, Judge Ferrell instructed the jury that it could consider only the statutory mitigating circumstances, he went on to explain that the statute explicitly provided for the jury's consideration of "any other circumstance or circumstances arising from the evidence which [they] deem[ed] to have mitigating value." Trial/Sentencing Tr. at 4470. Elaborating on this catchall provision in the statute, Judge Ferrell read the jury ten non-statutory mitigating circumstances that had been established by Petitioner's evidence and admonished them to "consider any other circumstance arising from the evidence which [they] deem[ed] to have mitigating value." *Id.* at 4471. This same "open-ended" instruction, permitting the jury to consider any circumstance arising from the evidence which appeared to have mitigating value, was found to be constitutional in *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), because it "in no way precluded [the jury] by the operation of law or the instructions of the court from considering any evidence relevant to mitigation." *Barfield v. Harris,* 540 F.Supp. 451, 471 (E.D.N.C.1982), *aff'd,* 719 F.2d 58 (4th Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984).

The failure of the trial judge to submit the non-statutory mitigating circumstances to the jury in writing and to require the jury to indicate its findings on each non-statutory mitigating circumstance does not amount to a federal constitutional violation. At most, it represents a violation of state law, a matter not cognizable by a federal court on habeas review. *See Briley v. Bass,* 750 F.2d 1238, 1244 (4th Cir. 1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct.

1855, 85 L.Ed.2d 152 (1985). Moreover, the Court notes that, before beginning his charge, Judge Ferrell gave each juror a copy of the instructions which contained a list of the ten non-statutory mitigating factors. Accordingly, the Court finds from the evidence before it that Judge Ferrell's instructions did not prevent the jury from considering all relevant mitigating evidence and that no prejudice resulted from his failure to submit non-statutory mitigating circumstances to the jury in writing or to require the jury to make findings on each non-statutory mitigating circumstance. Accordingly, the instant claim will be dismissed.

### IV.

Petitioner contends that, by presenting the underlying facts of his Georgia rape conviction at sentencing, the prosecution violated his due process and Eighth Amendment rights to a fair sentencing hearing.

In 1974, Petitioner was convicted in state court in Georgia upon his pleas of guilty to the felony charges of rape and burglary.[7] After the jury found Petitioner guilty of first-degree murder in the instant case, the prosecutor stated his intention to use the testimony of Petitioner's previous victim to establish that both the rape and burglary were felonies "involving the use or threat of violence to the person," an aggravating circumstance under N.C.Gen.Stat. § 15A–2000(e)(3). Defense counsel moved to suppress Ms. Huff's testimony on a number of grounds. First, counsel argued that the burglary conviction could not be used as an aggravating factor because the "use or threat of violence to the person" was not an element of the offense. The trial judge ruled in Petitioner's favor on this issue and precluded testimony about the burglary. On direct appeal, however, the North Carolina Supreme Court held that this ruling was incorrect and that § 15A–2000(e)(3) included felonies which were committed through the use or threat of violence to the person, regardless of whether violence was an element of the offense.

The defense next argued that the fact of Petitioner's rape conviction should be suppressed because, prior to his murder trial, Petitioner had challenged the validity of the conviction in a state habeas action which was still pending. When Judge Ferrell denied the Motion to suppress, defense counsel argued that the prosecutor should be precluded from offering evidence about the details of the rape because such evidence would inflame the jury and because the use or threat of violence was an element of the offense and was established for sentencing purposes by the evidence establishing the conviction. Concommitantly with his arguments, counsel tendered a stipulation acknowledging Petitioner's rape conviction, Trial/Sentencing Tr. at 4213; nonetheless, the court declined to suppress Ms. Huff's testimony.

The direct examination of the victim, Mary Huff, consumes seven pages of transcript. *See* Trial/Sentencing Tr. at 4225–32. Ms. Huff testified that Petitioner had raped her at knifepoint, threatening to kill her and her young daughter. In the cross-examination, which covered eighteen pages of the trial transcript, Ms. Huff was asked about her marital status; contradictions between her prior statements and her direct examination; the length of time it took her to contact the police after the incident; and the bruises, scratches or marks on her body as a result of the rape. *See* Trial/Sentencing Tr. at 4232–51.

On direct appeal, Petitioner claimed, among other things, that the purpose of Ms. Huff's testimony was to inflame the passions of the jury and that it violated his due process rights by injecting extraneous emotional factors into the jury's sentencing decision. The North Carolina Supreme Court held that Ms. Huff's testimony was properly admitted, despite Petitioner's stipulation, because under North Carolina law, "every circumstance calculated to throw

---

**7.** Petitioner was represented by counsel when he pleaded guilty to the rape charge. Evidentiary Hearing Tr. at 150–52.

light upon the alleged crime is admissible."[8] 308 N.C. at 22, 301 S.E.2d 308.

■ The admissibility of evidence in state trials is a matter of state law and procedure and does not involve federal constitutional issues unless "circumstances impugning fundamental fairness or infringing specific constitutional protections" are present. *Grundler v. North Carolina,* 283 F.2d 798, 802 (4th Cir.1960). *See also Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983); *Barfield v. Harris,* 719 F.2d 58, 61 (4th Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984); *Chance v. Garrison,* 537 F.2d 1212 (4th Cir.1976). Accordingly, the issue which must be addressed is whether Ms. Huff's testimony rendered Petitioner's sentencing hearing so fundamentally unfair that the resulting death sentence amounted to a denial of due process. *See Barclay v. Florida,* 463 U.S. at 947, 957–58, 103 S.Ct. at 3428–29.

■ The Supreme Court has long recognized that, for sentencing purposes, "justice generally requires ... that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (citing *Pennsylvania ex rel. Sullivan v. Ashe,* 302 U.S. 51, 55, 58 S.Ct. 59, 60, 82 L.Ed. 43 (1937)). *Accord, Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). Indeed, upon a recent review of its death penalty decisions, the Court reiterated that, in capital cases, "it is *constitutionally* required that the sentencing authority have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to the imposition of a death sentence." *Sumner v. Shuman,* — U.S. —, —, 107 S.Ct. 2716, 2720–21, 97 L.Ed.2d 56 (1987) (citing *Gregg v. Georgia,* 428 U.S. at 189 n. 38, 96 S.Ct. at 2933 n. 38) (emphasis in original). This requirement has evolved from the jury's duty to make "an '*individualized* determination' of whether the defendant in question should be executed, based on the 'characteristics of the individual and the circumstances of the crime.'" *Booth v. Maryland,* — U.S. —, —, 107 S.Ct. 2529, 2531–33, 96 L.Ed.2d 440 (1987) (citing *Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983)) (emphasis in original). So long as evidence is relevant to the issues to be determined by the sentencing jury, it is admissible even though it increases the likelihood that the defendant will be sentenced to death. *Barefoot v. Estelle,* 463 U.S. 880, 905, 103 S.Ct. 3383, 3401, 77 L.Ed.2d 1090 (1983).

■ Since the Supreme Court's death penalty decisions display a willingness to allow "the fullest information possible," concerning a defendant's record and character to be placed before the sentencing jury, *Williams v. New York,* 337 U.S. at 247, 69 S.Ct. at 1083, it is clear that Ms. Huff's carefully circumscribed direct testimony did not inject fundamental unfairness into Petitioner's sentencing hearing. Unlike the situation in *Booth v. Maryland,* — U.S. —, 107 S.Ct. 2529, 96 L.Ed.2d 440, where the Court found that the introduction of Victim Impact Statements violated the Eighth Amendment, Ms. Huff's direct testimony focused on Petitioner and his actions on the night of the rape and did not concentrate on such impermissible factors as the effect of the rape on her or her family. Although defense counsel did attack Ms. Huff's credibility in the ensuing cross-examination, he did not convert the examination into the type of "mini-trial" which the Court in *Booth* found to be distracting to a sentencing jury. *See* —, 107 S.Ct. at 2535–37, 4839.

"[T]he rules of evidence generally extant at the federal and state levels anticipate that relevant, unprivileged evidence should be admitted and its weight left to the factfinder, who would have the benefit of

---

8. N.C.Gen.Stat. § 15A–2000(a)(3) provides that, in the sentencing hearing for a capital felony, "[e]vidence may be presented as to any matter that the court deems relevant to sentence, and may include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (e) and (f). Any evidence which the court deems to have probative value may be received."

cross-examination and contrary evidence by the opposing party." *Barefoot v. Estelle,* 463 U.S. at 898, 103 S.Ct. at 3397. The evidence at issue here did not exceed this general standard of admissibility and certainly did not violate Petitioner's constitutional rights to a fair sentencing proceeding. Accordingly, the instant claim must fail.

### V.

In his final allegation, Petitioner alleges that the North Carolina death penalty law is unconstitutional because it is administered in an arbitrary, capricious and discriminatory manner. Petitioner divides this allegation into two different claims:

(A) That the practice of automatically submitting second-degree murder as an alternative to a finding of first-degree murder, even when the evidence does not support the lesser offense, is unconstitutional; and

(B) That the death penalty in North Carolina is unconstitutionally administered and applied based upon racial considerations.

### A.

■ Petitioner initially raised Claim A in his Motion for Appropriate Relief. After restating the claim and reviewing the procedural history relating to it in three brief paragraphs, Judge Snepp concluded:

In this case, the evidence as to the ingestion of drugs by defendant would have supported a verdict of guilty of second degree murder, so that its submission was proper under *Hopper v. Evans, supra.*

Finally, as to this contention[,] the defendant was in a position to adequately raise this issue upon appeal, but did not do so, N.C.G.S. 15A–1419(a)(3).

Therefore, I conclude that this contention is without merit, as a matter of law.

Memorandum Opinion and Order at 17.

Respondent contends that Petitioner procedurally defaulted on Claim A as evidenced by Judge Snepp's finding that "Petitioner could have raised this issue on direct appeal but failed to do so." Petitioner contends, on the other hand, that Judge Snepp "rule[d] only on the merits" of the claim, Petitioner's Reply Brief at 36, and that he "never expressly relied on ... § 15A–1419(a)(3), but just referred to it." *Id.* at 37.

Procedural default occurs when a habeas petitioner forfeits substantive review of his claims in state court by failing to comply with state procedural requirements.

The mere existence of a basis for a state procedural bar does not deprive [a federal habeas c]ourt of jurisdiction; the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case. ... "If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, [the habeas court], of course, will not undertake to review the decision."

*Caldwell v. Mississippi,* 472 U.S. 320, 327, 105 S.Ct. 2633, 2638–39, 86 L.Ed.2d 231 (1985) (citations omitted). *Accord, Davis v. Allsbrooks,* 778 F.2d 168, 175 (4th Cir. 1985).

It is clear from the language [9] of Judge Snepp's opinion that his decision was based, at least in part, on the state procedural bar. Consequently, Petitioner procedurally defaulted on Claim A and the Court cannot consider it unless Petitioner shows cause for his default and prejudice attributed thereto. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). *See also Cole v. Stevenson,* 620 F.2d 1055 (4th Cir.1980). Inasmuch as Petitioner has declined to address cause and prejudice asserting, instead, that procedural default is not applicable, the instant claim will be dismissed.

### B.

■ Petitioner next claims that the application of the death penalty in North Car-

---

9. Immediately after his reference to Petitioner's procedural default, Judge Snepp used the word "therefore" to introduce his conclusion that Petitioner was not entitled to relief. "Therefore" is defined as meaning "for that reason," "consequently," "because of that," and "on that ground." *Webster's New Collegiate Dictionary,* at 1210 (1977 ed.).

olina is unconstitutional because it is arbitrarily and discriminatorily imposed on the basis of racial considerations. The only support for this claim offered by Petitioner is two statistical studies conducted in North Carolina. The first was compiled by Professor Samuel Gross, who studied all homicides committed in North Carolina from 1977, the inception of the current capital sentencing statute, through the end of 1980. Professor Gross concluded that killers of whites faced a three-and-one-half times greater risk of a capital sentence than killers of blacks. The second study, conducted by Professor Barry Nakell and Kenneth A. Hardy, was based on various state records, interviews with defense attorneys and interviews with prosecutors. From the results of their investigation, Nakell and Hardy concluded that, all other factors being equal, defendants in cases with white victims were six times more likely to be found guilty of first-degree murder than defendants in cases with non-white victims.

The claim Petitioner raises here is the same one addressed by the Supreme Court in *McCleskey v. Kemp*, —— U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). In *McCleskey*, the petitioner claimed that the administration of the Georgia death penalty statute violated the Equal Protection Clause and he supported this claim with the Baldus study, a statistical study conducted in Georgia which purported to show a disparity in the imposition of the death sentence based on the victim's race and, to a lesser degree, the defendant's race. Holding that, in order to prevail, the petitioner had to "prove that the decision makers in *his* case acted with discriminatory purpose," the Court denied relief, finding that the Baldus study was insufficient to support even an inference of the requisite purpose. *Id.* at ——, 107 S.Ct. at —— (emphasis in original).

The *only* evidence Petitioner offers in support of his claim of an "arbitrary, capricious and discriminatory capital punishment system" is the statistical results from the Gross study and the Nakell and Hardy study. In the absence of evidence establishing that the jurors in his case acted

with discriminatory purpose, the instant claim will be dismissed.

### CONCLUSION

The Court has carefully reviewed Petitioner's allegations to determine whether he could prove any set of facts in support of his claims that would entitle him to relief under § 2254. Finding no basis in fact or in law for Petitioner's allegations, a Judgment denying Petitioner's application for a writ of habeas corpus will be entered simultaneously herewith.